Jeff Oven, Bar No. 6-3371
CROWLEY FLECK PLLP
490 North 31st Street, Suite 500
P.O. Box 2529
Billings, MT 59103-2529
Telephone: (406) 252-3441
Facsimile: (406) 252-5292
joven@crowleyfleck.com

Timothy Stubson, Bar No. 6-3144
CROWLEY FLECK PLLP
152 N. Durbin, Suite 220
Casper, WY 82601
Telephone: (307) 265-2279
Facsimile: (307) 265-2307
tstubson@crowleyfleck.com

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| TIMOTHY MELLON, a Wyoming resident, | ) Cause No.:  13-CV-118-SWS |
| | ) |
| Plaintiff, | ) |
| vs. | ) |
| | ) |
| THE INTERNATIONAL GROUP FOR | ) |
| HISTORIC AIRCRAFT RECOVERY, a | ) **MEMORANDUM IN** |
| Delaware non-profit corporation and | ) **OPPOSITION TO DEFENDANTS'** |
| RICHARD E. GILLESPIE, | ) **MOTIONS FOR SUMMARY** |
| | ) **JUDGMENT** |
| Defendants. | ) |

_____

Comes Now the Plaintiff, by and through his attorneys Crowley Fleck, PLLP and provides the following in opposition to Defendants' motions for summary judgment.

## I.
## Introduction

The defendants The International Group for Historic Aircraft Recovery ("TIGHAR") and Richard E. Gillespie ("Gillespie") presently move for summary judgment on plaintiff's claims. For the reasons and grounds which follow, the motion should appropriately be denied.

## II.   <u>Factual Record</u>

**1.   TIGHAR**

The International Group for Historic Aircraft Recovery (TIGHAR) is an organization whose stated purpose is the archeological and historic investigation of historic aircraft.   (Exhibit 1) (Gillespie Depo. pp. 43-44).  Among its primary and most visible projects is an effort to unlock the mysteries of Amelia Earhart's disappearance.   TIGHAR was formed in 1985 by Defendant Richard Gillespie and his wife Patricia Thrasher.   (Gillespie Depo. at 27-28).  Since its inception Gillespie has served as the organization's executive director and his wife has served as its president.  *Id.*

Gillespie and Thrasher are the only full-time employees of TIGHAR.   (Gillespie Depo. pp. 76-77).  TIGHAR's offices are and have always been located in Gillespie's home.  (Gillespie Depo. pp. 77-78).   Gillespie is paid rent for the use of that space.   (Gillespie Depo. p. 78). Gillespie has taken a salary from TIGHAR from the time it was first formed.   (Gillespie Depo. p. 77).  The amount that Gillespie is paid is dependant, in part, on the amount of donations received by TIGHAR.   (Gillespie Depo. p. 83).   While Thrasher and Gillespie serve at the pleasure of a board of directors, they decide what to pay themselves out of TIGHAR's coffers.   (Gillespie Depo. p. 84).   During the 2011-2012 fiscal year TIGHAR brought in more revenue than any other year of its existence in large part due to Mellon's contribution.  (Gillespie Depo. p. 91).  As a result, Mr. Gillespie saw an increase in his salary.   (Gillespie Depo. at 92-93).

TIGHAR is governed by a board of directors who are hand-selected by Gillespie. (Gillespie Depo. p. 95).   He nominates board members.   (Gillespie Depo. p. 94).   There are no board members that Gillespie did not know prior to their selection.   (Gillespie Depo. p. 97).

There has never been anyone placed on the board over his objection and no one has served on the board that was not hand-picked by Gillespie.  *Id.*

Gillespie has wide authority over the operations of TIGHAR. He has led most of its expeditions. (Gillespie Depo. p. 27).  He writes the group's promotional materials. *Id.* He is **the** fundraiser for TIGHAR. *Id.* He and his wife set TIGHAR'S budget. *Id.*  This budgeting authority includes determining how unrestricted donations that are made to TIGHAR will be used. (Gillespie Depo. p. 31-32)  By his own admission, TIGHAR would not exist without the efforts of Gillespie and his wife.  (Gillespie Depo. p. 48).  TIGHAR's life, breath and movement are reflections of Gillespie's will.

**2.     The 2010 Niku VI Expedition.**

TIGHAR'S primary and most visible project is the effort to solve the mystery of Amelia Earhart's disappearance.  To further that mission, TIGHAR has made a total of eleven (11) trips to Nikumaroro in the Republic of Kiribati. (Gillespie Depo. p. 104).  It launched its first expedition there in 1989.  (Gillespie Depo. p. 89).  In 2010 TIGHAR decided to launch a new expedition to the Island of Nikumaroro seeking to find evidence of the Earhart aircraft. TIGHAR organized the expedition around two components.   First, TIGHAR reached an agreement with Seabotix to provide a remote operated vehicle (ROV) in order to search the waters off of Nikumaroro.  (Gillespie Depo. p. 119).  TIGHAR also planned to conduct an archeological search on the island itself.  (Gillespie Depo. p. 118).

From May 18, 2010 through June 14, 2010, TIGHAR launched what it called the NIKU VI expedition.  (Exhibit 2, p.2).  During the expedition, TIGHAR utilized an ROV to conduct an underwater search of the area to the Northwest of the island.  (Exhibit 2 at 6).  The focus of the

search was a 300 meter by 300 meter area just off the reef surrounding Nikumaroro. (Exhibit 2, at 8; Rodocker Depo. p. 21).

The ROV was equipped with lighting and with two cameras, one utilizing high definition film and one using standard definition film. (Gillespie Depo. p. 160).   The search area concentrated on an area near the sighting of what has become known as the "Bevington Object". The "Bevington Object" was an object identified in a photo taken in 1937 after the Earhart disappearance and appeared to show an item resting on the reef. (Exhibit 2, p. 8). TIGHAR operated on a hypothesis that the "Bevington Object" was a portion of the Earhart airplane and that the wreckage of the plane might be located off the edge of the reef where the object had been photographed.  (Exhibit 2, p. 8).

While operating the ROV during the NIKU VI expedition, the ROV happened upon one confirmed man-made object.  (Gillespie Depo. p. 123).  Near where the Bevington object had been photographed, the ROV filmed what was identified as a piece of rope and what TIGHAR suspected was wire. (*Id.*).   In reality, the ROV filmed several pieces of debris that belong to the Earhart plane in the area of the rope and the wire.  (Exhibit 3, Jarrell Report attached as Exhibit 4).  However, TIGHAR only identified those two items during the trip. (Gillespie Depo. p. 123). Given the finding of man-made items in the area where the wreckage was discovered TIGHAR directed that the ROV return to examine the area the day after the discovery. (Rodocker Depo. p. 47).  Due to technical problems, the area could not be relocated.  (Rodocker Depo. p. 47).

Following the Niku VI expedition, TIGHAR apparently engaged in only rudimentary analysis of the footage obtained by the ROV.   Finally, in April of 2011, TIGHAR once again began to focus on the footage, particularly the "rope and wire" footage. (Exhibit 5).  TIGHAR forwarded the footage to select members including Jeff Glickman, a man who makes his living

conducting forensic analysis of images. *Id.*  Gillespie sent e-mails noting that Glickman had found "suspicious objects" and noted that in Gillespie's own review of the footage "I've already had a couple 'WTF was that?' moments.  We really need to look closely at all of this stuff." (Exhibit 22).  Other TIGHAR members who had accompanied the 2010 expedition eagerly requested the opportunity to look at the images that Glickman was finding. (Exhibit 23). Glickman's review confirmed man-made objects consistent with wreckage of the Earhart aircraft at the exact location that TIGHAR suspected the wreckage to be.  (Exhibit 3).  Specifically, Glickman identified segments of rope and items that he believed to be rods or taught cables. (Exhibit 3).

The discovery caused a flurry of excitement at TIGHAR causing one member to note "[the video] is something that would warrant the full brunt of TIGHAR curiosity.  It's not just the rope. It's the rope in the same vicinity as the rods just offshore the Nessie [Bevington Object] location."  (Exhibit 6).  What TIGHAR discovered was indeed a debris field that demonstrates the presence of the Earhart wreckage.  (Exhibit 4).

Ric Gillespie communicated with Jeff Glickman and warned him that he should keep his findings secret.  (Exhibit 7).  As Gillespie put it "news like this is so good that it could prompt some hotshot millionaire glory hunter to decide to beat us to the 'treasure'." (Exhibit 7). One important motivation for the decision to conceal their discovery was the fact that TIGHAR did not have an exclusive agreement with the Republic of Kiribati that would protect TIGHAR's rights to discovered artifacts.  (Gillespie Depo. pp. 153-154). Although they had been visiting the island of Nikumaroro for over twenty years, TIGHAR had not acquired and apparently had not requested an exclusive agreement with Kiribati.  (Gillespie Depo. pp. 153-154).  All of that changed within days of the discovery of debris in the 2010 footage.  (*Id.*).

Prior to approaching Kiribati in 2011, TIGHAR only had an Agreement covering certain artifacts collected from Nikumaroro in 1989.  (Exhibit 8). TIGHAR certainly couldn't publicize that they had found the Earhart wreckage when they had no agreement for exclusivity that would allow them to protect and capitalize on their find.

Within two days of acknowledging that Jeff Glickman had found "suspicious objects" in the 2010 film, Ric Gillespie e-mailed an official with the Republic of Kiribati.  (Exhibit 22, Exhibit 9). In that e-mail Gillespie asked "to work out an agreement that will protect the interests of all the parties if and when the wreckage of the plane is discovered."  *Id.* Then Gillespie went on to describe the very real danger TIGHAR now faced after having discovered the debris field.

> There is a popular perception in the U.S. and elsewhere that the recovered wreckage of the Earhart airplane would have great monetary value.  The stronger the evidence becomes that the wreckage of the plane is in the waters adjacent to Nikumaroro, the greater the danger of an unauthorized attempt to find and recover it.

*Id.*  The discovery of the wreckage adjacent to the Island created a critical need for an agreement between TIGHAR AND Kiribati. On April 26, 2011 Glickman forwarded Gillespie some of the specifics regarding his findings.  (Exhibit 3). Within hours, Gillespie was forwarding additional inquiries to officials in Kiribati. (Exhibit 9).  Finally in 2012, TIGHAR obtained an agreement with Kiribati which was negotiated by Gillespie and board member Bill Carter. (Gillespie Depo. p. 221).

As problematic for TIGHAR as the lack of an agreement with Kiribati were the limitations placed on them by an agreement with Discovery Communications.   In 2009, TIGHAR began discussions with Discovery Communications about funding and publicizing TIGHAR expeditions.  (Gillespie Depo. pp. 141-143). As part of its efforts, TIGHAR entered into an Exclusive Expedition Agreement with Discovery that covered both the 2010 and 2012

- 6 -

expeditions.   (Exhibit 10).  As part of that agreement, Discovery was given significant exclusive rights regarding publicizing findings of the expeditions.   (See eg. Exhibit 10 at p. 8 ¶ F). Defendants expressly promised that they could not make a disclosure of any conclusive discoveries and instead that right and the benefits associated with that right belonged only to Discovery Communication.   (Exhibit 21). TIGHAR could not undertake its own efforts to publicize its findings and could not sell its media rights to any other party because of the terms of the Discovery agreement.  Instead, when wreckage was found in 2010, Discovery was given the sole right to announce and publicize that fact.   Those restrictions, of course, could not be enforced if TIGHAR were to conceal that information from them.

**3.      The Mellon Donation.**

In the spring of 2012 TIGHAR began seeking assistance from the U.S. Government in reviewing photos of the Bevington Object. (Gillespie Depo.   pp. 114-115). The U.S. State Department, under the direction of Secretary of State Hillary Clinton, reviewed the photos and lent its support to TIGHAR'S efforts.  (Gillespie Depo. p. 115-116).  There is no indication that TIGHAR informed the U.S. Government of its findings from the 2010 expedition or disclosed the proximity of the underwater debris to the Bevington object.  Instead, the U.S. Government's support was based upon review of historic photographs with no disclosure of the under-water debris.

After requesting that the U.S. Department of State confirm its findings regarding the Bevington photo, TIGHAR began to receive pressure from the U.S. Government to undertake a new expedition to Nikumaroro. (Gillespie Depo. at pp. 107, 116).  Although TIGHAR wanted more time to prepare and raise money for an expedition the State Department offered significant

publicity if they were able to mount an expedition in the summer of 2012.  (Gillespie Depo. p. 107).

On March 20, 2012 TIGHAR, Secretary Clinton and U.S. Transportation Secretary Ray LaHood, held a press conference extolling TIGHAR'S efforts and promoting its next trip to Nikumaroro.  (Gillespie Depo. p. 109).  During that press conference Gillespie spoke at length about what TIGHAR had found, but steadfastly stuck to the position that they had found none of the wreckage.   Instead, he noted that finding the airplane was the key goal of the 2012 expedition.   (http://www.youtube.com/watch?v=WGbYeZAvTYk,  22:00-24:00).  In  fact, Gillespie expressly noted in his address to the public that "it is the searching that is important." (*Id.* 28:25-28:35).  Gillespie made those statements specifically intending for potential donors to rely upon them.  (Gillespie Depo. p. 145).  Based upon his statements and press releases, The Casper Star Tribune printed a story discussing the search which was spotted by Plaintiff, Timothy Mellon. (Exhibit 20).   Importantly, Gillespie has admitted that he authored press releases and other publicity materials related to the Earhart search. (Gillespie Depo. p. 27). TIGHAR mislead the public, including Plaintiff by contending it had not yet found wreckage consistent with the Earhart Electra.    In  fact, TIGHAR's representations announced that the purpose  of  the  expedition  was  to  locate  wreckage  of  the  Earhart  Airplane  specifically representing that the wreckage had still not been found.

After seeing the comments made in TIGHAR's press event of March 20, 2012, Tim Mellon contacted Richard Gillespie to express his interest in supporting the trip.  (Exhibit 11). Within days they spoke by phone about the expedition and about the financial requirements of the expedition.  Again, Gillespie failed to disclose that the wreckage had already been located. Instead, he expressed that he needed $2 million to search for the plane and test out his hypothesis

that the plane wreckage was located near Nikumaroro. (Gillespie Depo. p. 110, Mellon Depo. p. 21-22). Gillespie and Mellon spoke by phone two or three times prior to Mellon's gift. (Mellon Depo. p. 29). Gillespie also forwarded a number of materials about TIGHAR's quest to find the airplane. (Exhibit 12). Based upon his review of those materials and the representation made, Mellon donated approximately $1,000,000.00 worth of stock in order to support the coming expedition. (Exhibit 13).

**4.      The 2012 Niku VII Expedition.**

TIGHAR undertook its most recent expedition, the Niku VII expedition, in July, 2012. The expedition's largest sponsor was Timothy Mellon who also accompanied TIGHAR to Nikumaroro. Once again, TIGHAR utilized an ROV in the course of its expedition.

The contrast between TIGHAR'S use and review of the underwater film obtained during the 2012 expedition and its review of the 2010 footage are striking. Although TIGHAR waited approximately nine months to engage in a thorough review of the 2010 footage, TIGHAR forwarded its 2012 footage to its volunteer expert within days. (Exhibit 14).

While Gillespie told TIGHAR's board that they must keep any discoveries quiet after the 2010 expedition, he immediately publicized tantalizing findings after the 2012 expedition. Following the expedition, TIGHAR immediately sent the film to Jeff Glickman. (Exhibit 14). Gillespie told Glickman "[t]he Discovery show will air Sunday, August 19 at 10pm PT. It would be more than nice if we could come up with something interesting before then." (*Id.*). As if on cue Glickman found a host of debris in the same area that the rope and wire footage was collected. (Exhibit 15). Gillespie immediately contacted Discovery and told them "We have what appears to be a debris field just offshore where the 'landing gear' object appears in the

1937 Bevington Photo."  *Id.*  Significantly, this same disclosure could have been made after the discoveries in April, 2011, but it was not.

### III.     STANDARD OF REVIEW

**A.     Applicable Pleading Standards.**

Rule 56(c) of the Federal Rules of Civil Procedure directs the entry of summary judgment in favor of a party who "shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A principle purpose "of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 274 (1986).  The court's inquiry is to determine "whether there is the need for a trial, whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 213 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact by informing the court of the basis for its motion.  *Martin v. Nannie and the Newborns, Inc.,* 3 F.3d 1410, 1313 (10th Cir. 1993) (quoting *Celotex*, 477 U.S. at 323).  Once the moving party properly supports its motion, the non-moving party "may not rest upon the mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  *Muck v. United States,* 3 F.3d 1378, 1380 (10th Cir. 1993).

In applying the summary judgment standard, the court construes the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.  *Deepwater Invs. Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir.

1991).  However, the mere existence of some alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment.  *FDIC v. Hulsey,* 22 F.3d 1472, 1481 (10th Cir. 1994).

## IV. ARGUMENT

1.   **FRAUD CLAIMS**

The elements of fraud require proof that: (1) the defendant made a false representation intended to induce action by the plaintiff; (2) the plaintiff reasonably believed the representation to be true; and (3) the plaintiff relied on the false representation and suffered damages. *Excel Constr. Incl. v. HKM Engineering, Inc.,* 2010 WY 34,¶ 33, 228 P.3d 40, 48-49 (Wyo. 2010). The plaintiff must prove that the defendant knew the representation was false or that the maker of the misrepresentation was at least aware that he did not have a basis for making the statement. *Id.*

In proving fraud it is usually necessary to consider surrounding circumstances.  "Since it is most difficult to prove intent by direct evidence, circumstantial evidence is necessary." *Butcher v. Butcher (Matter of Estate of Reed)*, 566 P.2d 587, 590-91 (Wyo. 1977).   In some respects fraud claims are like black holes. While it may be impossible to see the actual object, compelling evidence exists when looking at its impact on surrounding circumstances.  So it is with TIGHAR's fraud in this case.

TIGHAR's entire defense is premised upon the argument that they did not make any false representations because the Earhart wreckage has not been found off of Nikumaroro and if the 2010 footage contains images of the wreckage they certainly had no knowledge of that fact.   The evidence, however, is compelling that Defendants knew they had found the wreckage and they intentionally concealed that fact.

The Court should understand that Plaintiff does not contend that Defendant's knew from the first instance what they had uncovered.  In fact the evidence indicates that during the course of the 2010 expedition Defendants did not have any idea of the larger implications of their work. During the entire course of the underwater search in 2010, Defendants found only two man-made objects.   On June 7, 2010 they located a rope with a loop and a piece of wire at approximately 250 meters in depth.   (Exhibit 16).  The discovery caused understandable excitement because it was the only man-made material discovered off this uninhabited island and it was in the exact location that TIGHAR expected wreckage of the plane to be located.   After a cursory review of the footage TIGHAR attempted to relocate the items.  Jesse Rodocker testified that TIGHAR suspected man-made objects in the rope and wire footage and directed him to return to the sight. (Rodocker Depo. p. 47-48).  However, because hardware on the ROV had been damaged, they were unable to relocate the items.

The key events in discovering the full scope of the wreckage contained in the 2010 footage did not happen until April, 2011.   While the TIGHAR undertook very limited review of portions of the footage upon the conclusion of the expedition, in April of 2011, Ric Gillespie discovered that significant footage existed that he was unaware of.  (Exhibit 5).  He concluded that TIGHAR needed to engage in a careful review of the footage and began to communicate with other board members about a significant discovery and voiced his concerns that someone else might attempt to exploit the discovery. (Exhibit 5; Exhibit 7).   After twenty years of searching in Kiribati, TIGHAR finally discovered an urgency for negotiating an agreement with the Republic of Kiribati that would allow it to protect and capitalize on its discoveries.  (Exhibit 9).   Finally, TIGHAR's imaging specialist issued his brief but titillating report noting that numerous man-made objects could be found in the "rope and wire" footage.  (Exhibit 3).

The evidence when assembled as a whole provides a clear and compelling picture that in April, 2011  TIGHAR discovered exactly what they had sought to discover.  Defendants learned that it had a video of not just the rope and wire, but of a debris field consistent with the Earhart wreckage. This debris field was in the exact location where they expected it to be.  Take away their denials and their conduct in seeking to protect their find and their efforts to warn board members to conceal information about this significant find is exactly what you would expect from TIGHAR in the shadow of their discovery.

The motivation for concealing their knowledge is also clear from the record.  After they returned Gillespie noted that some treasure hunter might go find the "treasure".  Consequently, although they had been visiting Nikumaroro for almost two decades TIGHAR finally decided to negotiate an agreement with the Republic of Kiribati.  By TIGHAR's own admission, disclosure of their discovery before that agreement was in place put their ability to capitalize on the discovery at risk.

Also significant to the issue of fraud and cover-up are TIGHAR's continuing representations regarding their findings.  Despite their own repeated admissions, TIGHAR continues to deny discovery of the debris field.   This continued denial serves as strong evidence of TIGHAR's intent to defraud.

While TIGHAR now argues that information related to the 2012 expedition is irrelevant, proof of continuing misrepresentations regarding TIGHAR'S findings helps to demonstrate their fraudulent intent with respect to the representations made to Mr. Mellon.  Gillespie continues to deny finding wreckage and continues to argue that there are not items in the water consistent with the Earhart Electra.  (Gillespie Depo. P. 7).  This despite the fact that TIGHAR's own analysis in private e-mails indicated that there was 1) 100% chance that underwater imagery

contained man-made items and an 80% chance that those items were related to what TIGHAR believes to be wreckage of the Lockheed Electra 10E landing gear. (Exhibit 17).

Defendants seem to contend in some respects that Mr. Mellon is at fault in this matter because he did not undertake an independent investigation to see if Mr. Gillespie was being truthful. Certainly they cite no law that would impose such a requirement. Given the facts of this case, the argument is particularly perplexing. Mr. Gillespie himself recognizes that he is an expert on the disappearance of Amelia Earhart. (Gillespie Depo. p. 58). He cites his 26 years of experience in researching the Earhart disappearance, thousands of hours of research into the subject and his book on the subject. (Gillespie Depo. p. 58). To argue that Mr. Mellon had no right to rely upon Gillespie's statements regarding the status of the search for Earhart is to take the position that one is under a legal obligation to discount TIGHAR's professed expertise. Mr. Mellon spoke to only Mr. Gillespie regarding this matter. He took Mr. Gillespie at his word. That reliance is not something that excuses fraud on TIGHAR's part.

Defendants also place great emphasis on their argument that the fraudulent statement is an opinion. They argue that it is merely Gillespie's opinion that the wreckage is not contained in the 2010 footage and as such it can't be the basis of a fraud claim. In making the argument Defendants misconstrue Mr. Mellon's claim and the misrepresentation that lies at the heart of this case.

The question of whether the Earhart wreckage lies on the ocean floor off of Nikumaroro is one of fact. Whether TIGHAR discovered that wreckage is an issue of fact. This is not simply a contrast of opinions as Defendants portray. Instead, TIGHAR's misrepresentations dealt with a basic fact; did TIGHAR find the wreckage and did they falsely contend that the wreckage had not been found. The totality of the evidence demonstrates the plane is there.

Plaintiff's experts have identified airplane parts consistent with the plane exactly where TIGHAR says the wreckage should be. (Exhibit 4). TIGHAR's own volunteer expert has stated that there is 100% chance that the same area searched in 2010 has identifiable man-made objects and that there is an 80% chance they are related to the Earhart plane.

While TIGHAR now dismisses the presence of the wreckage in this proceeding, it is worth noting that the methodology used by Plaintiff's experts is identical to the methodology that Jeff Glickman, Plaintiff's forensic analyst used and advocated. (See Exhibit 4 at P. 2; Exhibit 24). Contrary to the image conjured in Defendants' brief, the experts in this case confirm that the wreckage is present and is documented in the 2010 film. Plaintiff's experts note that in addition to the rope and wire plainly visible in the 2010 film, "there are other objects observed which are man-made". (Exhibit 4 at 2). Even Defendant's own expert acknowledges that there are pieces of metal evident in the 2010 video. (Exhibit 18). TIGHAR in its own materials has acknowledged that the very parts that have been found near Nikumaroro could only come from the Earhart Electra. (Exhibit 19 at p. 47).

This case is not about whether TIGHAR and Gillespie agree with Tim Mellon's assessment of the 2010 footage. Instead, it is simply about whether Defendants found man-made objects off of an uninhabited island in the middle of the Pacific Ocean in the exact location that they expected they would find them, items which are entirely consistent with the Earhart Aircraft, items that have no explanation other than belonging to the Earhart Aircraft. More simply it is a case about whether Defendants represented to Tim Mellon that they were still looking for the wreckage despite that finding. No amount of parsing, and no amount of obfuscation can cover the fact that TIGHAR lied about what they had found and they did so in order to obtain donations, including Mr. Mellon's donation, in support of their expeditions.

2.      **NEGLIGENT MISREPRESENTATION CLAIMS**

Most of the foregoing evidence applies equally to Plaintiff's negligent misrepresentation claim.   Defendants accurately outline the elements of negligent misrepresentation, but fail to appropriately apply those elements.   Negligent misrepresentation requires a showing that:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Hulse v. First American Title Company of Crook County,*  2001 WY 95, ¶ 52, 33 P.3d 122, ¶ 52 (Wyo. 2001) (internal quotes and citations omitted).   A fundamental difference between fraud and negligent misrepresentation is, "a plaintiff need only prove negligent misrepresentation by a preponderance of the evidence, not unlike any other plaintiff in any other action sounding in negligence. . . ." *Dewey v. Wentland,* 2002 WY 2, ¶ 10, 38 P.3d 402, 410 (Wyo. 2002).

Defendants argue that Mr. Mellon has failed to show a false statement was made.   As outlined above, such an argument ignores the overwhelming weight of evidence against Defendants in this case.   In addition to arguing that there was no misrepresentation, Defendants also argue that there is no evidence of the reasonable standard of care applicable to TIGHAR in obtaining information related to the wreckage.   As a result, they argue that there can be no negligent misrepresentation claim.   Specifically, Defendants point toward the expert opinions offered in this case and argue that they show no negligence on the part of TIGHAR in making claims that it had not yet found the wreckage.   Defendants' argument fails because of their refusal to acknowledge the damning evidence that is found in the testimony of both Mr. Gillespie and his own expert reports regarding the standard of care.

Defendants' failure to act with reasonable care is perhaps most clearly illustrated when considering the issue of scale and how it relates to identifying items of wreckage.   In criticizing the expert analysis of the 2010 video, Gillespie makes much of the fact that there were no scale marker's used during the 2010 expedition.   He asserts that scale is critical to identifying any items when using an ROV.  (Gillespie at P. 9).  At the same time he admits that TIGHAR did nothing during its work in 2010 to allow it to determine scale.  *Id.*

Jesse Rodocker, a representative of Seabotix, the company that leased the ROV to TIGHAR and operated it on their behalf during 2010, noted in his testimony that Seabotix had tools readily available to determine scale.   (Rodocker Depo. at 22).  Gillespie was familiar with methods that could be easily used to determine scale.  (Gillespie depo. p. 11).  Despite that fact and despite the fact that scale was critical, TIGHAR did not request to use the laser site that could determine scale, a factor that Gillespie himself identifies as critical.  (Rodocker Depo. at 22-23).  While Plaintiff's experts have been able to utilize rigorous analytics to determine scale, TIGHAR's own reviewers indicated that there was no way for them to determine scale from the footage alone.   (Glickman Depo. p. 125).  This is especially disturbing given the fact that TIGHAR's photographic reviewer mentioned that scale was the second most important factor in image analysis. (Glickman Depo. p. 77).

Similarly, TIGHAR's own experts argue that the only way to identify the wreckage is "to turn over and reposition an object several times to be certain that a postulated identity survives multiple perspectives."  (Exhibit 19).    This is described as a "minimum". *Id.*    Despite Gillespie's self professed status as an expert on searching for the Earhart wreckage, it is undisputed that when TIGHAR found what it knew to be man-made objects, exactly where TIGHAR expected the wreckage to be, they did nothing to reposition, recover or turn over the

items and had no arm on the ROV at that time.  (Rodocker Depo.  p. 54). (Glickman ground truth).

If TIGHAR misrepresented the status of their search because of their failure to exercise reasonable care in identifying the wreckage and Mr. Mellon relied upon that misrepresentation, Mr. Mellon has a viable claim.  In this case TIGHAR failed to utilize the most basic elements that Gillespie and his experts say were required to adequately identify the wreckage.  These are standards that Defendants themselves have recognized as basic and fundamental for the work that they were doing, yet they completely failed to meet those standards while conducting their work.  As a result, they failed to identify the wreckage to Mr. Mellon prior to his donation.  The record demonstrates that Mellon has a claim for negligent misrepresentation that should be allowed to go to a jury.

## 3.    GILLESPIE PERSONAL LIABILITY

Defendant argues against holding Richard Gillespie personally liable contending that he was only acting in his official capacity.  In making the argument Defendant ignores both the substantial factual record in this matter and the legal obligations of Mr. Gillespie.

First, Defendant asserts that there is no evidence that Mr. Gillespie solicited funds for his own benefit in this matter.  That factual representation is simply not accurate.  To the contrary the evidence establishes that Gillespie directly benefited from his fraudulent conduct.   TIGHAR is a creation of Gillespie and his wife Patricia Thrasher. (Gillespie Depo. pp. 27-28).  They were solely responsible for creating the entity and they uniquely benefit from its operations.  TIGHAR rents office space from Gillespie. (Gillespie Depo. p. 78).   TIGHAR has only two full-time employees, Gillespie and his wife. (Gillespie Depo. pp. 76-77).   Most importantly Gillespie's pay is directly tied to the amount of fund raising that TIGHAR is able to do.  Gillespie decides

what he will take out of the corporation in the form of pay and if fund raising is higher, he is able to pay himself more.    (Gillespie pp. 83-84).   To say that Gillespie did not benefit from his fraudulent representations is to ignore the realities of his cozy and dominant relationship with TIGHAR.

Even more fatal to Defendant's argument is their assertion that somehow Mr. Gillespie's position as Executive Director of TIGHAR immunizes him from the results of his own fraud. Defendant spends much time arguing that Gillespie was acting in his capacity as executive director of TIGHAR and then makes the unsupported leap that only TIGHAR can be held responsible for his conduct.   The law mandates a very different conclusion.

This court has determined previously that an officer or agent of a corporation may be held individually liable for the tort of the corporation if there was "active participation or cooperation in, a positively wrongful act of commission or omission which operates to the injury or prejudice of the complaining party . . . ." *Wellborn v. Mountain Accessories Corporation,* 23 F.Supp.2d 1321, 1327 (D.Wyo. 1998) (citing *Zimmerman v. First Federal Savings and Loan Ass'n of Rapid City S.D.,* 848 F.2d 1047, 1051 (10th Cir. 1988); *see also  Lobato v. Pay Less Drug Stores,* 261 F.2d 406, 409 (10th Cir. 1958). In other words, if an individual injures a person through their tortuous acts, they are liable whether they are acting as an agent of the corporation or not.

Defendants cite limited legal authorities that address the scope of an agent's authority and law governing an agent's ability to bind its principal. *See e.g.* 3 Am.Jur.2d Agency §§ 71, 75. None of these have any relationship whatsoever to whether Gillespie can be held personally liable for his own fraudulent conduct.   Certainly none of the authorities cited by Defendants

stand for the proposition that a corporate representative can commit fraud or can misrepresent facts and escape liability simply because he is a corporate representative.

Defendants further attempt to confuse the issue by citing this court to holdings related to governmental immunity for officials acting in their official capacity. *See Matthews v. Wyoming department of Agriculture,* 719 P.2d 216 (1986).   In relying on these authorities Defendants underline the simple fact that a private party acting on behalf of a private organization enjoys no such immunity.

The factual record makes clear that Gillespie was responsible for all the relevant representations.   He was the only representative of TIGHAR that Mr. Mellon dealt with prior to the donation.  (Mellon Depo. p. 21).  Mr. Gillespie authored the various promotional materials and releases related to the Earhart project.   (Gillespie Depo. p. 27).   Gillespie made his representations with the full knowledge, expectation and intent that donors would rely upon them.  (Gillespie Depo. p. 145).   For Defendants to now argue that his position as Executive Director absolves him for responsibility for those actions is simply fanciful.

## V.  <u>Conclusion</u>

Defendants argue that there are no factual questions in this matter by closing their eyes to significant portions of the record.   When looking at the record there is ample evidence to demonstrate that TIGHAR knew of the presence of the Earhart wreckage from the 2010 footage prior to discussing financial contributions with Mr. Mellon.  When they spoke with Mr. Mellon they represented that they had not found the wreckage and that the purpose of the trip was to locate the wreckage.  TIGHAR then embarked on an expedition funded by Mr. Mellon to locate what they already had located.   In light of this fraud, Plaintiff's claim is viable and should be permitted to proceed to trial.

DATED this 9th day of July, 2014.

CROWLEY FLECK PLLP
Attorneys for Plaintiff

By:   /s/   Timothy Stubson
JEFF OVEN, Bar No. 6-3371
P. O. Box 2529
Billings, MT  59103-2529

TIMOTHY M. STUBSON, Bar No. 6-3144
152 North Durbin Street, Suite 220
Casper, WY 82601

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served upon the following counsel of record, by the means designated below, this 9th day of July, 2014:

[ ]  U.S. Mail
[ ]  FedEx
[ ]  Hand-Delivery
[ ]  Facsimile
[ ]  Email                    *Counsel for Defendant(s)*
[X]  ECF Electronic filing


/s/ Timothy M. Stubson
Jeffery J. Oven
Timothy M. Stubson