1

<pre>
 1   UNITED STATES DISTRICT COURT
     FOR THIS DISTRICT OF WYOMING
 2   CASE NO. 13CV118-S

 3   _____

     DEPOSITION OF RICHARD E. GILLESPIE
 4

 5   TIMOTHY MELLON,
     a Wyoming resident,
 6
                  Plaintiff,
 7
            vs.
 8
     THE INTERNATIONAL GROUP
 9   FOR HISTORIC AIRCRAFT RECOVERY,
     a Delaware non-profit corporation;
10   and RICHARD E. GILLESPIE,

11              Defendants.

12   _____

13          152 North Durbin Street, Suite 220
                   Casper, Wyoming
14            Tuesday, April 1, 2014

15

16        PURSUANT TO NOTICE, the deposition of

17   RICHARD E. GILLESPIE was taken in accordance with the

18   applicable Wyoming Rules of Civil Procedure at 152

19   North Durbin Street, Suite 220, Casper, Wyoming,

20   commencing at the hour of 8:30 a.m., the 1st day of

21   April 2014, before me, Janet K. Jamieson, a Certified

22   Court Reporter and Notary Public of the State of

23   Wyoming.

24

25
</pre>

COPY

5

1    P R O C E E D I N G S
2    **RICHARD E. GILLESPIE,**
3    called for examination by the Plaintiff, being first
4    duly sworn, on his oath testified as follows:
5    **EXAMINATION**
6    BY MR. STUBSON:
7    Q.    Mr. Gillespie, can you state your full name
8    and spell your last name for the record, please?
9    **A.    Sure.  My name is Richard Ellsworth Gillespie,**
10   **and my last name is spelled G I L L E S P I E.**
11   Q.    Okay.  And we've, of course, met a couple
12   times before; but just for the record, I'm Tim
13   Stubson.  I'm representing Mr. Mellon in this action
14   and appearing on his behalf today.
15         And you were in attendance at Mr. Mellon's
16   deposition yesterday?
17   **A.    Yes, I was.**
18   Q.    Okay.  Just -- I won't go through the full
19   gamut of instructions, I know your Counsel has
20   covered those things with you, but just a couple
21   reminders as we get started.  One is if you need a
22   break at any time today, just let me know and we can
23   do that.  If there is a question pending, I'm going
24   to ask you to answer the pending question before we
25   take a break, but we can take a break at any time.

6

1          And then the other significant thing, the
2    other important thing is if you don't understand one
3    of my questions, please ask me to rephrase it or let
4    me know that you don't understand it.  Because
5    otherwise, I'm going to assume that you have
6    understood it -- understood it and have answered it
7    appropriately, okay?
8    **A.    Right.**
9    Q.    The -- what have you reviewed in preparation
10   for your deposition today?
11   **A.    Nothing in particular.**
12   Q.    Okay, no documents?
13   **A.    No.**
14   Q.    Okay.  Where are you currently employed?
15   **A.    I am the executive director of TIGHAR, The**
16   **International Group for Historic Aircraft Recovery.**
17   Q.    Okay.  Do you believe TIGHAR has found the
18   wreckage of the Earhart Electra near Nikumaroro
19   Island?
20   **A.    No.**
21   Q.    Okay.  Do you believe that TIGHAR has found
22   wreckage consistent with the Earhart Electra near
23   Nikumaroro Island?
24   **A.    We have artifacts we found on land that we**
25   **believe appear -- no, we believe are consistent,**

7

1    based on the available evidence.
2    Q.    And what about materials or items in the
3    water, have you found any items in the water that you
4    believe are consistent with the Earhart Electra?
5    **A.    Not in my opinion, no.**
6    Q.    Have you reviewed the expert reports that
7    were filed in this case?
8    **A.    Yes, I have.**
9    Q.    Have those had any impact on your opinions
10   with respect to whether there is wreckage consistent
11   with the Earhart Electra near Nikumaroro?
12   **A.    Yes.**
13   Q.    In what way?
14   **A.    They reinforced my opinion that no wreckage**
15   **has been identified.**
16   Q.    And how have they done that?
17   **A.    I haven't seen anything in the expert**
18   **reports that seems like a valid identification of**
19   **anything, except possibly the rope.  And I agree with**
20   **the identification of the rope.**
21   Q.    Okay.  And you do not agree with any other
22   identification found in those reports?
23   **A.    That's correct.**
24   Q.    Do you disagree at all with the methodology
25   utilized in the reports?

8

1    **A.    Yes, I do.**
2    Q.    And how so?
3    **A.    I don't think it follows the scientific**
4    **method.**
5    Q.    In what way?
6    **A.    There is no -- well, first, I should back up**
7    **and describe scientific method, being gathering**
8    **information, forming a hypothesis, and testing the**
9    **hypothesis.**
10   **The methodology used here was to identify --**
11   **it appears to me, from reading the reports, it**
12   **appears to me that Mr. Mellon's experts tried to**
13   **match shapes of known components of the Electra**
14   **airplane to shapes in the coral without any reliable**
15   **information about the scale.  Anybody can do that.**
16   **You can make a drawing, a CAD drawing, that you can**
17   **twist around and scale any way you want to and then**
18   **try to shape it -- try to fit it to an underwater**
19   **shape and say, well, there it is.  It's just not**
20   **valid.  There's -- there's no -- there's no scale.**
21   **There is no way to know that what you're looking at**
22   **is anything like what you're saying it is.**
23   Q.    In conducting the underwater search in 2010
24   -- well, let me back up.
25         So in analyzing any of the images underwater

9

1  from either of the searches, 2010 or 2012, do you
2  believe scale is important?
3      A.   Scale is very important.  Of course, it is.
4      Q.   Would you describe it as critical to
5  identifying items?
6      A.   To identifying items, yes.
7      Q.   Did -- what did TIGHAR do in order to ensure
8  that it could determine scale during the 2010
9  expedition?
10     A.   The ROV had a claw on it that could be -- of
11 known dimensions, that could be held up to objects
12 that we were interested in.
13     Q.   Was the claw ever utilized in that manner in
14 2010?
15     A.   No.
16     Q.   Was there anything else that you had
17 available to you to determine scale as part of the
18 2010 expedition?
19     A.   Not that I recall, no.
20     Q.   And what about the 2012, was there anything
21 utilized to determine scale in the 2012 expedition?
22     A.   Same technique.  The ROV had a claw of known
23 dimensions that could be held up.
24     Q.   And was the claw utilized in that manner at
25 any time during the 2012 expedition?

10

1      A.   A couple times, yeah.
2      Q.   Okay.  At any time with any wreckage other
3  than wreckage associated with the Norwich City?
4      A.   I'm sorry, say that again.
5      Q.   Was it utilized to determine the dimension
6  or scale for any objects other than those that were
7  associated with the Norwich City?
8      A.   There was an object sticking up out of the
9  sea floor that we were curious about.  We didn't know
10 whether it was a piece of Norwich City wreckage or
11 not.  It was in the general vicinity of Norwich City.
12 And we actually went in and grabbed it and pulled it
13 out.  It was just a piece of steel, rusted steal, and
14 it came apart.
15          There was also a time when Wolfgang, the ROV
16 operator, there was a piece of -- we suspected it was
17 vegetation, it had a white ball on the end of it, and
18 we went and grabbed that and actually brought it back
19 to the surface, brought it aboard ship, and it was a
20 piece of marine vegetation.  But those are the only
21 times I remember the claw being used.
22     Q.   Okay.  And in those cases, those two you've
23 just mentioned, it sounds like it was used to
24 actually retrieve items --
25     A.   Uh-huh.

11

1      Q.   -- is that correct?
2      A.   Yeah.
3      Q.   Were there any occasion where the claw was
4  utilized to determine scale --
5      A.   Yeah --
6      Q.   -- of an item?
7      A.   -- there were.  I remember Wolfgang
8  extending the claw and opening it up and holding it
9  up to something, but I don't remember the specifics
10 of what that object -- whatever it was, we decided it
11 wasn't anything important.
12     Q.   And did it involve any sort of official
13 calculations, or anything, comparing the dimensions
14 of the claw with the scale of what the object was?
15     A.   Well, we knew the dimensions of the claw,
16 and he held the claw up to whatever it was we were
17 looking at and he said, oh, that's so many inches.
18     Q.   Are you aware that there are standard
19 methods out there for determining scale as part of
20 search and salvage operations?
21     A.   Yes, I understand that.
22     Q.   And what are some of those methods?
23     A.   I believe there's a laser rangefinder.  As a
24 matter of fact, we plan to use such a device on the
25 manned submersibles we hope to use later this year.

12

1      Q.   And there was actually discussion about
2  using those prior to the 2012 expedition, wasn't
3  there?
4      A.   I don't recall.
5      Q.   But you don't disagree that that's a
6  possibility?
7      A.   That's a possibilities, sure.
8      Q.   But they ultimately were not used as part of
9  the 2012 expedition.
10     A.   Not that I -- I don't remember any laser
11 rangefinders out there.
12     Q.   What other disagreements do you have with
13 the methodologies utilized by the experts that we've
14 hired in this case?
15     A.   There was something like 19 hours of video
16 shot during the 2010 trip, and all of it looks pretty
17 much alike.  It's underwater coral, debris.  We saw a
18 little bit of Norwich City wreckage, but we never got
19 deep enough to see the main body of wreckage, as we
20 did in 2012.
21          So there's all this footage; but as far as I
22 know, the experts are only looking at the footage
23 where Mr. Mellon said he saw debris.  So it's all
24 being taken out of context.  I have to wonder if they
25 had an opportunity to review the other hours and

25

1  think he ever even reviewed that, because we didn't
2  find the airplane on the 2001 trip.
3        And at that point he decided we were
4  completely wrong about our theory, and he then
5  decided that he was going to buy an underwater -- a
6  remote underwater vehicle and conduct his own search.
7  He spent a lot of money on that, but never actually
8  did anything, and then he died.  And his airplane is
9  now in the Seattle Museum of Flight, but -- the
10 Electra he bought.
11       So I don't think that's selling -- we
12 weren't selling media rights, specifically; we sold
13 the commercial exploitation rights.
14    Q.   Okay.  Other than that, the two thousand --
15 was that 2001, you said?
16    A.   That was for the 2001 trip.
17    Q.   Okay.  Other than that, up until the 2010
18 agreement with Discovery, any other agreements with
19 media related to your expeditions?
20    A.   We went back out in 2007, but we didn't have
21 -- Mark -- we hired Mark Smith ourselves for that
22 one, and Mark shot video for us, but we didn't have a
23 media contract.
24    Q.   And what did you -- did you sell that --
25    A.   No.

26

1     Q.   -- video or do anything with that?
2     A.   No, it -- we -- it's still in the can.  It's
3  great video.  We'll use it.
4     Q.   The -- you talked about Kammerer going out
5  with his own submersible.
6     A.   He never actually went out.
7     Q.   Okay.
8     A.   He -- he bought -- or he hired somebody with
9  a submersible.  And they did tests on the submersible
10 and it didn't perform to specs, and he ended up suing
11 the guy, I understand.
12    Q.   Okay.  Have there, to your knowledge, been
13 any other -- other than those conducted by TIGHAR,
14 been any other underwater expeditions, for lack of a
15 better word, to Nikumaroro?
16    A.   The New England Aquarium does marine
17 biology, coral reef research, at Nikumaroro.  And
18 they've run, boy, I'm not sure of the number, but at
19 least three trips to the Phoenix Islands, including
20 Nikumaroro.
21    Q.   Anybody else other than the New England
22 Aquarium?
23    A.   I heard that there was a group out of
24 California, a small non-profit, who I just learned
25 the other day had been out there looking at the reef.

27

1  It's scuba diving stuff.  They didn't have any remote
2  sensing technology.  But they were out there looking
3  at the reef, marine biology stuff.  And they were
4  keeping it very quiet because they knew that the
5  New England Aquarium had a special deal with the
6  Republic of Kiribati, the Phoenix Islands Protected
7  Area, and they didn't want to get crosswise with
8  them.  But I just learned about that the other day.
9  As far as I know, that's the only time anybody else
10 has been out there.
11    Q.   Tell me your title with TIGHAR.
12    A.   Executive director.
13    Q.   Okay.  And how long have you served in that
14 capacity?
15    A.   Since the inception of the organization.
16    Q.   Which was when?
17    A.   1985.
18    Q.   And what -- can you give me a thumbnail
19 sketch of what your duties are as executive director?
20    A.   Well, I'm the fundraiser; I direct the
21 research; I write most of the material; I've led most
22 of the expeditions, not all; I direct it in an
23 executive manner.
24    Q.   Are you responsible for setting the budget
25 for TIGHAR?

28

1     A.   Along with my wife, who is my partner.
2  Yeah, we -- both of us work it seven days a week.
3  And setting the budget is -- is a matter of saying
4  what do we want to accomplish, how much do we think
5  it's going to cost, and let's see how much we can
6  raise, if we can raise enough to do what we want to
7  do.
8     Q.   And what's your wife's name?
9     A.   Pat, Patricia, Patricia Thrasher.
10    Q.   And has she also been with the organization
11 since its inception?
12    A.   Uh-huh.  She's --
13    Q.   Make sure --
14    A.   -- the president.
15    Q.   -- you say "yes" or "no."
16    A.   I'm sorry?
17    Q.   Make sure you say "yes" or "no."  You said
18 --
19    A.   Yes.
20    Q.   Okay.
21    A.   She -- she is -- she's the organization's
22 president.
23    Q.   And is that the capacity she has served in
24 since the beginning --
25    A.   That's right.

29

1    Q.   -- since '85?

2         The -- are you the one that's primarily

3    responsible for publicity, and that sort of thing,

4    with TIGHAR?

5    A.   Yes.

6    Q.   And when you said you write most of the

7    materials, would that include your mailings to

8    members?

9    A.   Yes.

10   Q.   And that would -- what else, what other

11   kinds of things would that include?

12   A.   I've got a copy of my book.

13   Q.   Okay.

14   A.   And emails.  We have an active online forum,

15   and I'm usually active on the forum.  There have been

16   times -- obviously, when I'm out of the country I'm

17   not, but I try to stay active on the forum.  There's

18   lots of email correspondence, there's -- there's

19   constant contact, email newsletters.

20   Q.   What about press releases, do you write

21   those most of the time?

22   A.   Yes.

23   Q.   Are there occasions when somebody else would

24   write those?

25   A.   Yes.

30

1    Q.   Who, who else would be responsible?

2    A.   There was a lot of research done on a little

3    jar that we found on the island, an ointment pod that

4    once contained freckle -- freckle cream.  And there

5    was a lot of -- there was a lot of scientific

6    research done to establish that.  And the guy who was

7    leading that research project is a TIGHAR member from

8    Massachusetts named Joe Cerniglia.  And that's

9    C E R N I G L I A.  And Joe -- and discoverynews.com

10   is always eager for our news, and so almost all of my

11   press releases, and the one that Joe wrote, go

12   through discoverynews.com.  It's a great system for

13   us, because Discovery News puts it up on their

14   website and everybody else grabs it from there and

15   it's distributed.

16   Q.   How long have you been working in that sort

17   of relationship with discoverynews.com?

18   A.   Since the 2010 expedition.

19   Q.   The -- are you the one that's responsible

20   for prioritizing projects for TIGHAR?

21   A.   Yes and no.  We have a project called the

22   Devastator Project that is aimed at recovering a

23   World War II torpedo bomber from a lagoon in the

24   Marshall Islands.  And one of TIGHAR's board members,

25   a man named Russell Matthews, is really passionate

31

1    about that project.  He has a family foundation that

2    -- his family has a foundation that he has access to,

3    and Russ does the Devastator Project.  Now, I -- I

4    oversee it in just a very general sense, but that's

5    primarily Russ' baby.

6         We have another project in the UK called the

7    Maid of Harlech, a World War II fighter that is in a

8    beach in North Wales near the -- near Harlech Castle.

9    And a TIGHAR member over there named Matt Rimmer is

10   the lead on that project.

11   Q.   And -- oh, go ahead.

12   A.   So, yeah, we -- I delegate this stuff as

13   much as I can.  But the Earhart Project takes so much

14   of my time that I'm -- I'm primarily doing the

15   Earhart Project.

16   Q.   As far as allocating the resources of TIGHAR

17   among those various projects, is that a decision that

18   you make?

19   A.   Not entirely, because donations toward the

20   Devastator Project are earmarked for the Devastator

21   Project, so that money goes to the Devastator

22   Project.  And so there are certain contributions

23   that, you know, if -- if a contribution is earmarked,

24   that's where the money goes.  So money that comes in

25   for the Earhart Project goes to the Earhart Project.

32

1    General support means for general support.  Many

2    donations aren't specified, and they go wherever

3    they're needed most.

4    Q.   And you make those decisions?

5    A.   I make those decisions.  Well, I should say

6    I make those decisions along with my wife, yeah.

7    Q.   Tell me a little bit about that.  Your wife,

8    what are her primary responsibilities, then, with the

9    organization?

10   A.   She maintains our website; she's in charge

11   of member services, that is the sending out of

12   renewals, fulfillment of orders for like T-shirts,

13   ball caps, that kind of thing, and DVDs, information;

14   she maintains the member database, which is a huge

15   thing.

16        We have one part-time employee who does

17   fulfillment, which is data entry stuff.

18   Q.   Who is that?

19   A.   The name of our --

20   Q.   (Nodding head.)

21   A.   Her name is Sandra -- she just started

22   working for us.  I don't remember her last name.

23   She's -- she's a 17-year-old Mexican-American girl we

24   hired who -- whose peers were giving her a hard time

25   about wanting to go to college and having a job, and

41

1 happened to Nungesser and Coli?
2         Meanwhile Lindbergh is -- they didn't make
3 it.  He comes across to New York.  Now the lone
4 American boy takes off where the French heros -- the
5 dark horse -- the dark horse takes off where the two
6 French heros have failed.  If you were a publicity
7 manager for Charles Lindbergh, you couldn't have
8 planned it any better.  Because when he makes it to
9 Paris, they're a forgotten ingredient in the hysteria
10 that greeted Lindbergh.  The first thing that
11 Lindbergh did after he got some sleep in Paris, and
12 he advised the American Embassador, was to visit
13 Nungesser's, the pilot, his mother, to express his
14 condolences.
15         A big mystery, huge in France to this day.
16 Most Americans don't know anything about it.  It's
17 the most important lost airplane in history.  Much
18 more important than Amelia Earhart.  Because if they
19 had arrived in New York, as everyone expected them
20 to, Lindbergh would not have flown the Atlantic.  And
21 if Lindbergh had not flown the Atlantic, all of the
22 things that happened because Lindbergh flew the
23 Atlantic would have at least happened differently.
24 All of those Americans who were inspired to get into
25 aviation and design the airplanes that won World War

42

1 II, that would have been different.
2         What happened to the White Bird?  It's a
3 huge, huge mystery.
4         So Yankee Magazine tells about a hermit in
5 Maine named Anson Berry.  A wonderful name.  And he's
6 living up in the woods and he's on a canoe fishing on
7 Round Lake, way up east, and -- on a morning in 1927,
8 and he hears an airplane overhead in the fog.  And
9 the engine goes to sputtering, he said.  And then in
10 the hills west of the lake, there are three hills
11 that rise, he heard a faint rip and crash.
12         And there's a -- in the article there's a
13 map that shows the hill -- the lake and hills, the
14 area, like a search area.  And the article ends:
15 Some day a hunter may run across a rusted engine in
16 the woods and a great mystery will be solved.
17         And I looked at that and I said, what do you
18 mean somebody some day will come across it?  You've
19 got a map, man; this needs to be investigated.  But
20 I've got a job, I'm busy.  But when I left the
21 insurance business, I've got to find something to do.
22 I've got child support to pay and I -- and I've -- I
23 mean, I want to investigate this.  So I went to some
24 former insurance clients and I said, hey, if we can
25 find this airplane, it would be great publicity for

43

1 you guys.  So if you will fund -- we didn't have a
2 non-profit, or anything.  It was just me.  And I'm
3 going to go up and I'm going to see if I can find
4 this airplane, if you'll fund the trip.
5         And one of my clients says, yeah, yeah, that
6 would be great, you know, we'll do that.
7         I called my brother, my younger brother, and
8 dragged him along with me, and we went up to Maine
9 and we trouped through the woods, and we didn't find
10 the White Bird.  We talked to a lot of people, we
11 collected stories, we did archival research, and came
12 back and said this is really cool.  I mean, this is
13 fun.  This is a great -- I wonder if I could make a
14 living doing this?
15         And so I went to other former insurance
16 clients and they said this is a great investigation,
17 we can do this.  And one of my former clients I went
18 to was a man named Richard C. "Kippy" duPont in
19 Delaware.  A Delaware duPont.
20         And I -- about the same time I met my wife,
21 who was to become my wife, Pat.  And she was not
22 happy doing what she was doing.  She had gone to one
23 year of law school and decided she didn't want to be
24 a lawyer after all, and was running a housecleaning
25 service in Norfolk, Virginia.  Chesapeake, Virginia,

44

1 actually.  And we -- we met at a social event.  And
2 she came up to Maine with me a couple of times and
3 enjoyed it.  And I went to Kip duPont, I said, Kip,
4 do you think it would be possible to form a
5 non-profit foundation that would treat this kind of
6 investigation, historical investigation, as a real
7 scientific discipline, rather than just grave robbing
8 and treasure hunting?  And we could have members and
9 they -- get enough members to pay the operating
10 expenses, and we could raise money for expeditions
11 and take on some difficult challenges, maybe recover
12 some airplanes?
13         And he said he thought that was a great
14 idea.
15         And I said, the trouble is, you know, I --
16 it's going to take time to get a non-profit set up,
17 and I've got to live.
18         He said, tell you what I'll do.  I'm going
19 to make you a $35,000 unsecured interest-free loan
20 personally, and you'll live on that for the next year
21 and get your 501(c)(3).  And then after you do that,
22 I'll make a charitable contribution to the
23 non-profit, which you can use to repay the -- the
24 non-profit can pay you and then you can repay my
25 loan.

45

1        Okay, sounds good to me.
2        And he did that.  But then before -- and we
3 got our 501(c)(3) in December of -- no, no, January
4 of 1985.  But before Kip could make his charitable
5 contribution, he died of a heart attack.
6 Fortunately, his estate forgave the loan.
7        But here was TIGHAR, sort of up and running
8 as a 501(c)(3).  TIGHAR was -- Pat and I sat down at
9 a coffee table in her apartment one day and just came
10 up with The International Group for Historic Aircraft
11 Recovery, because it made kind of an interesting
12 acronym that we could pronounce like an animal and it
13 sounded like a good idea.  So that's the way that all
14 happened.
15        And our problem then was that this --
16 meanwhile, Kippy duPont had given us a four-room
17 house, it didn't feel much bigger than this room, on
18 his airport that we could live in for $250 a month
19 rent.  It was a dump, but we got it cleaned up and we
20 were doing all right.  And we were building
21 memberships and getting a board directors -- we had a
22 board of directors put together.  But we were on the
23 airport, and the same airport, Summit Aviation, did a
24 lot of avionics work for the CIA.  They did covert
25 installations -- they did installations on aircraft

46

1 of material to be used in covert operations.  They
2 did not want press around that airport at all, and
3 here we've got reporters from the New York Times
4 coming to visit us in a house on the
5 airport.  And the airport management is going
6 bananas.  We can't have these guys here.  So we were
7 evicted.  We were thrown off the airport.  So we had
8 to rent a house in town in Wilmington.
9        Q.   Was that after duPont's death that you were --
10        A.   Yeah, yeah.  You know, as long as Kippy was
11 there, they couldn't throw us off; but once Kippy was
12 gone, the new management said now we're going to get
13 rid of these guys, and they did.  We rented a house
14 in Wilmington.
15        MR. MASTERSON:  Excuse me.  I'm sorry, Tim.
16 I'm going to step out for just a few minutes, I
17 apologize, to do a short call; but obviously, you're
18 in good hands, and I apologize.
19        THE DEPONENT:  No problem.
20        MR. MASTERSON:  Thank you.
21        (Mr. Masterson not present.)
22 BY MR. STUBSON:
23        Q.   I want to go back and ask you a couple of
24 follow-up questions on that.
25        A.   Yeah.

47

1        Q.   First of all, how old were you when you
2 first got a pilot's license?
3        A.   A pilot's license?  I soloed my senior year
4 in high school.  That was 1965.  And I guess I was
5 how old?  I was born in 1947, so what's that, 17?
6        Q.   Something like that.
7        A.   Yeah.  I was way too young.  A kid that age
8 alone in an airplane, it's like a monkey with a
9 straight razor.  I had a lot of fun.
10        Q.   And you survived it.
11        A.   Yes.
12        Q.   The -- other than -- when you first started
13 TIGHAR, other than you, Pat, and Mr. DuPont through
14 his sponsorship, was there anybody else involved in
15 the --
16        A.   Yeah, we had a board of directors.
17        Q.   Okay.  How did you --
18        A.   Friends -- friend in the aviation community
19 that I had come to know while I was in the insurance
20 business.
21        Q.   And how big was your board of directors at
22 that time?
23        A.   I don't remember, but it was five or six
24 people, something like that.
25        Q.   Are any of those five or six people still

48

1 involved?
2        A.   No.  No.  None of them are still involved.
3        Q.   Is it fair to say that TIGHAR wouldn't have
4 started without your efforts and your wife's efforts?
5        A.   Oh, absolutely.
6        Q.   The -- other than the corporate formation
7 and getting a board of directors, what else did you
8 do to set up TIGHAR?  You didn't have any offices or
9 property?
10        A.   Well, we operated out of a little four-room
11 house at the airport.
12        Q.   Yeah.
13        A.   And, you know, I can tell you all the
14 stories about trying to produce newsletters with an
15 IBM Memory typewriter and rub-on graphics.  It was
16 primitive stuff.  And it was very, very lean.  I
17 mean, I can remember we had some posters made, and I
18 can remember Pat coming to me one day and just -- we
19 can't even make the $250 a month rent.  I don't know
20 what we're going to do.  And I remember grabbing up a
21 roll of those posters and heading up into town to
22 visit.  Let me see if I can sell enough posters to
23 pay the rent.  It was like that.
24        Q.   How long was it like that for?
25        A.   It's still like that sometimes, honestly.

57

1    Q.   Okay.  Would you consider yourself an expert
2  in underwater recovery?
3    A.   No.
4    Q.   So TIGHAR has to rely on others who are
5  experts in those areas?
6    A.   TIGHAR always relies on volunteer expertise.
7    Q.   What experience do you have in reviewing
8  underwater images?
9    A.   Just the experience that I've had directly
10  with the underwater images we've taken and with
11  underwater images I've seen of aircraft in like Truk
12  Lagoon.  You know, there's been a lot of video shot
13  by scuba divers of underwater airplanes and, you
14  know, I've -- I've looked at those.
15    Q.   Okay.
16    A.   Yeah.
17    Q.   Any special education or training on --
18    A.   No.
19    Q.   -- analyzing underwater images?
20    A.   No.
21    Q.   And so would you consider yourself an expert
22  in analyzing underwater images?
23    A.   Certainly not.
24    Q.   Would you consider yourself an expert on the
25  disappearance of Amelia Earhart?

58

1    A.   I think that's fair to say, yes.
2    Q.   Okay.  And why -- why would you say that?
3    A.   I have been the director of that project
4  leading the -- our research in the Amelia Earhart
5  disappearance for I think we're in our 26th year.
6  I've participated in and reviewed I can't begin to
7  guess how many thousands of hours of archival
8  research.  I wrote a book that's -- that documents
9  what's known about the Earhart disappearance
10  published by the Naval Institute Press.  It's
11  considered by many to be the most authoritative
12  source on the known facts of the Earhart
13  disappearance.  I'm proud of the book.
14    Q.   What --
15    A.   The world seems to think I'm an expert on
16  the Earhart disappearance.  I'm the one who gets
17  called.
18    Q.   What about the Earhart aircraft itself, are
19  you -- would you consider yourself an expert on the
20  aircraft itself?
21    A.   Yes, I would.
22    Q.   Okay.  And again, why do you believe that?
23    A.   Because I've spent so much time looking at
24  photographs of the airplane, official documents
25  relating to the airplane, existing Lockheed 10s, both

59

1  in museums and at crash sites.  Yeah.  And it's
2  pretty obvious why we want to do that, because we're
3  looking for artifacts that might be part of that
4  airplane.  And as part of the identification process,
5  you'd better be familiar with what you're looking
6  for.
7    Q.   And the resources, I know there was
8  discussion yesterday in Mr. Mellon's deposition about
9  drawings.
10    A.   Uh-huh.
11    Q.   Do you have other engineering drawings
12  related to the Electra?
13    A.   We have a copy of -- a digitized searchable
14  database of the original Lockheed engineering
15  drawings for the Model 10 Electra.  Now, those
16  drawings exist on microfilm at the Smithsonian, and
17  they are publicly available to anyone who wants to go
18  to the archives of the National Air and Space Museum
19  and put those reels of microfilm on the readers and
20  crank through them looking at the drawings.  To my
21  knowledge, we have the only digitized searchable
22  database of those drawings.  It just makes it a lot
23  easier.  And there are thousands of drawings.
24    Q.   You said that TIGHAR relies upon volunteer
25  experts.

60

1    A.   Yes.
2    Q.   Would those include TIGHAR members?
3    A.   For the most part, yeah.  Most of our
4  volunteer help are TIGHAR members.  There are
5  occasions when we need expertise and we go out and
6  hire expertise that we don't have within our
7  membership.
8    Q.   Okay.  And we'll talk about Mr. Glickman a
9  little bit down the road, but would he be an example
10  of a volunteer expert you relied --
11    A.   Yes, he's a volunteer.
12    Q.   What are some other volunteer experts you
13  relied upon for the 2010 expedition?
14    A.   The expedition in general or a specific part
15  of the expedition?
16    Q.   The expedition in general.
17    A.   To conduct the expedition, you know, that
18  2010 expedition involved a lot of land operations,
19  and that didn't require any -- any particular outside
20  expertise.  We know -- oh, well, okay, Tom King, our
21  senior archeologist, led the land operations there.
22  And I was with him, but I let Tom -- Tom is the
23  degreed archeologist, and Tom made the decisions
24  about how to search and where to search, and so
25  forth, on that.

73

1    Now, one of my favorite things in these
2  discussions is pointing out to people that when you
3  talk -- when you say "would have" in historic
4  investigation argument, "would have" is a guess that
5  masquerades as a fact.  Oh, Earhart would have turned
6  north because of whatever reason you come up with;
7  therefore, we can conclude....
8    No, you can't say that.
9    And you try -- and Gary was always what if
10 this, what if that?  Oh, Earhart and Noonan could not
11 have been on -- marooned on Gardner Island because
12 the Navy flew over the island in a search and they
13 would have seen her.
14   You can't say that.  You don't know what
15 they -- what happened.
16   And you go back and forth, and eventually if
17 you reach a point with someone where they're not
18 listening, they won't accept what you believe to be
19 good methodology -- and it's never about they won't
20 accept what we think.  That's not what it's about.
21 We welcome and encourage criticism and critique and a
22 lively discussion; but when somebody is just arguing
23 an invalid methodology and won't shut up, it turns
24 into trollism.  They are just out there to destroy
25 the effectiveness of the website.  And as the

74

1  executive director of TIGHAR, it's my responsibility
2  to look out for the -- the integrity of the
3  organization, the public face of the organization.
4    We have thousands of people, we don't know
5  how many people, come and look at that forum.  We
6  have a number of people registered to the forum,
7  several hundred, pushing a thousand, I think, but you
8  only register if you think you might want to post on
9  it.  But to just go and read it, you can do it, and
10 maybe you have.  Anybody can do it.  And we don't
11 know how many thousands of people read it.
12   And this is -- this is TIGHAR's discussion
13 going out there, and if we -- if people come to the
14 TIGHAR forum and read things and react this is crazy,
15 this is stupid stuff, they're going to go away and
16 they probably won't come back.  They won't ever
17 become TIGHAR members and they won't participate.
18 And we need the public.  That's what it's all about,
19 is a public forum.  So --
20 Q.  Who makes that decision, though?
21 A.  I do.
22 Q.  On terminating somebody?
23 A.  Yes.
24 Q.  Okay.  And how is it -- do the moderators
25 bring that to your attention, or how is that done?

75

1  A.  In some occasions, if I'm busy doing other
2  things and I haven't been looking at the forum, I
3  might get a message from a moderator saying, hey, you
4  know, have you seen what so and so posted?  He's at
5  it again.  He's doing -- you've already told him.
6    And I'll go and look at it and I go, oh,
7  okay.
8    The first step we do is put somebody on
9  moderation.  They don't toss them off, but we -- we
10 make it so that if they post something to the forum,
11 a moderator has to look at it and say, yeah, that's
12 okay, and put it up.  And in most cases, we do.  But
13 if they do something that we've already determined is
14 just not legitimate, something we've already dealt
15 with, then we might not put it up.  And if they're
16 persistent and aggressive enough, we'll -- we'll ban
17 them.  We've had some really vicious people on that
18 -- that forum, and you just -- you have to get rid of
19 them.
20 Q.  The -- is the approach currently with Tim
21 Mellon's posts to have moderators review them before
22 they are posted?
23 A.  No.  No, Tim is not moderated.
24 Q.  Has he ever been --
25 A.  No.

76

1  Q.  -- moderated?
2  A.  Not to my knowledge.
3  Q.  What -- if you were to give me a definition
4  of what the moderator's job or function is, what --
5  what do they do, what's their role?
6  A.  To make sure -- there are rules, posted
7  rules, for forum posts.  And they have to do with
8  civility and citing your sources and substantive
9  arguments.  We're not there to just chitchat.  There
10 are subjects of -- places you can go to just
11 chitchat.  But, you know, research thread or topic,
12 we want to be on-topic, talking about what we're
13 supposed to be talking about on this topic, and
14 making sense.  You don't have to agree, but you have
15 to make sense.
16 Q.  And you're the ultimate arbiter of whether
17 somebody --
18 A.  Somebody has to do it.
19 Q.  And you are that person?
20 A.  It's my job.
21 Q.  Okay.  Does TIGHAR have any sort of
22 endowment?
23 A.  No.
24 Q.  And you mentioned earlier, in talking about
25 TIGHAR's employees, it's you, your wife, your

77

1  part-time data entry person.
2     A.   Uh-huh.
3     Q.   Have there ever been any other employees
4  other than you and your wife and that current data
5  entry person?
6     A.   And we've -- we -- we've usually had some
7  kind of administrative assistant part time, but
8  that's -- other than that, no, it's always been me
9  and my wife.
10    Q.   And have you taken a salary from TIGHAR
11 since it was first formed in 1985?
12    A.   Sure.  Yes.
13    Q.   And has your wife taken a salary from TIGHAR
14 since it formed in 1985?
15    A.   She was for a while.  Now we count all of
16 the income to us as individuals under my name, for
17 tax reasons.
18    Q.   Okay.  And when did you start doing it that
19 way?
20    A.   God, I don't know, 2009, something like
21 that?
22    Q.   Okay.
23    A.   One way or another either side.
24    Q.   So -- and then TIGHAR's offices, are those
25 located in your home?

78

1     A.   Yes.
2     Q.   And have -- has that always been the case?
3     A.   That's always been the case.
4     Q.   And does TIGHAR pay you for the use of the
5  office space in your home?
6     A.   We -- we rent space in our home to TIGHAR.
7     Q.   Okay.  And has that always been at the same
8  location?
9     A.   No.
10    Q.   Well, you mentioned earlier that airport --
11    A.   There have been four locations.
12    Q.   Okay.
13    A.   The little house on the airport; then we
14 rented a house in Wilmington, a suburb of Wilmington;
15 and then through a campaign with the TIGHAR members,
16 we were able to buy a house, it's a split-level house
17 in that same development, and we were there for 21
18 years; and just this past December we moved from
19 there to an 11-acre farm near Oxford, Pennsylvania.
20 We are selling the house in Wilmington and we are
21 leasing the farm.  So once -- once we sell the house
22 in Wilmington, we will not be homeowners.
23    Q.   You will continue leasing the farm?
24    A.   Yes.
25    Q.   Okay.  And so currently the -- TIGHAR's

79

1  offices are located at that farm?
2     A.   At the farm.
3     Q.   And what's the mailing address?
4     A.   2366 Hickory Hill Road, Oxford, PA, 19363.
5     Q.   Who in TIGHAR is responsible for gathering
6  information for your tax filings?
7     A.   My wife.
8     Q.   Okay.  Do you review that information, as
9  well?
10    A.   Usually not, no.
11    Q.   Okay.  The -- and do you have an accountant
12 that actually files your returns --
13    A.   Yes.
14    Q.   -- for you?
15         Who is that?
16    A.   Citrin Cooperman in Philadelphia.  It's a
17 big accounting firm.
18    Q.   And how long have they been doing that work
19 for TIGHAR?
20    A.   Citrin Cooperman has been doing our stuff
21 for I think the last four years, something like that.
22         (Pause in proceedings.)
23 BY MR. STUBSON:
24    Q.   Mr. Gillespie, I'm going to hand you what
25 has been marked as Deposition Exhibit Number 23,

80

1  which was produced as part of your -- the discovery
2  from TIGHAR.
3     A.   Uh-huh.
4     Q.   Do you recognize that document?
5     A.   Yes.
6     Q.   And what is that?
7     A.   This is TIGHAR's Form 990 from fiscal year
8  2009.
9     Q.   Okay.  If you go -- let's see if I can find
10 the signature page.
11    A.   Yeah, good question.
12    Q.   It's not signed.
13         Under the signature block it's got your
14 wife's name; is that correct?
15    A.   Uh-huh, that's right.
16    Q.   Okay.  Now, have you looked at this document
17 before?
18    A.   Yes, I have.
19    Q.   Okay.  And you're familiar with the
20 information in the document?
21    A.   In a general sense.
22    Q.   Okay.  I just want to ask you about a couple
23 of different things with respect to this 2009 return.
24    A.   Uh-huh.
25    Q.   Now, looking down on lines 8 and 12, you see

81

1   -- so we've got information there regarding
2   contributions --
3       A.   Uh-huh.
4       Q.   -- and total revenue?
5       A.   Right.
6       Q.   And that would include both 2008 and 2009,
7   correct?  So you have got the prior year --
8       A.   Oh, yeah, okay.  Yeah.
9       Q.   Is that correct?
10      A.   Let me look at it again.  Contributions and
11  grants prior year, which would be two thousand --
12  fiscal year 2008, and current year.
13          Yep, okay.
14      Q.   Does your fiscal year -- looking at the top,
15  it looks like your fiscal year runs from July 1st to
16  June 30th?
17      A.   That's correct.
18      Q.   Okay.  And so fiscal year 2008 would
19  actually have run through June 30th of 2009, correct?
20      A.   These things always confuse the daylights
21  out of me.  Fiscal year -- this is report for fiscal
22  year 2009 to June 30, 2010.  So prior year would be
23  two thousand -- two thousand -- June (sic) 1st, 2008
24  to June 30, 2009, yes, okay.
25      Q.   Okay.  And you'll note down under line 12

82

1   there's, it looks like, a pretty sharp increase in
2   total revenue --
3       A.   Uh-huh.
4       Q.   -- from 224 to 909.
5           Do you remember what -- what would explain
6   that increase in revenue?
7       A.   No.
8       Q.   Okay.  And then under salaries, if you look
9   down on line 15, do you see that?
10      A.   Uh-huh.
11      Q.   And there's salary from the prior year of
12  14,873 --
13      A.   Uh-huh.
14      Q.   -- and for the current year of 159,000?
15      A.   Uh-huh.
16      Q.   Do you know what explains that increase,
17  that sharp increase in compensation over that time
18  frame?
19      A.   I -- the money was available to -- to pay us
20  more than had been available before.  And that's very
21  typical of TIGHAR.  You know, there are very lean
22  years, and then fund-raising for an expedition brings
23  in more -- more funding and we're able to satisfy old
24  debts by -- and TIGHAR can pay us more so that we can
25  -- we can make up for the -- you know, it's always

83

1   been flexible.  It has never made any sense to set a
2   set salary for us for TIGHAR, because in most cases,
3   you know, the board would approve something very
4   generous and we wouldn't be able to pay it and then
5   TIGHAR ends up owing us a bunch of money, and then it
6   was at a low, and it just got complicated.
7           So we -- we have evolved a system where as
8   long as we stay within the approved guidelines for
9   non profits, it's up to us to raise the money.  And
10  we -- if we're able to draw more from the
11  organization as salary, we do.  We report it to the
12  board, the board approves it, it's always within the
13  guidelines.
14          And man, I had forgotten, fourteen-eight?
15  God, how the hell did we live through that?
16      Q.   The -- so your -- the amount of your salary,
17  it sounds like, then, is somewhat dependent upon the
18  amount of money that TIGHAR brings in?
19      A.   Oh, yes.
20      Q.   Okay.
21      A.   Yeah.
22      Q.   And the -- tell me the process for
23  determining a salary.  Do you take a suggestion or a
24  proposal to the board, or how does that work?
25      A.   No, we report to the board what we did, and

84

1   the board looks at it.  I have to say that I -- we
2   have never had a case where the board has looked at
3   the financial information we reported to them and
4   said, hey, no, you're -- you're taking too much here,
5   you're making too much money.  There's never been
6   anything like that.
7       Q.   Is that determination on your compensation
8   determined at the end of the fiscal year?
9       A.   It -- it's determined -- what we do is when
10  we have a board meeting, we'll present financial
11  information to the board based on the most recent
12  fiscal year, and they review that and they can
13  comment on it.
14      Q.   The -- and is there a -- is it the board's
15  ultimate decision on what the compensation is?
16      A.   I serve at the pleasure of the board.  The
17  board can fire me and Pat at any time.
18      Q.   But my question was, is it their
19  determination on what your compensation is?
20      A.   No.
21      Q.   Okay.
22      A.   No, no, we -- we decide what TIGHAR can
23  afford to pay us.
24      Q.   Okay.
25      A.   That's the simplest way to put it.

89

1  so that they could come along.  They didn't have to
2  come along.  They -- it was a substantial part of
3  that, I can't tell you exactly how much, of the
4  expense of the expedition, with them making a
5  donation so that they could charter a boat to come
6  out and participate in the expedition.
7  BY MR. STUBSON:
8      Q.  Okay.  So it was funded through TIGHAR?
9      A.  Yeah.  Yeah, they -- they -- we chartered
10  the second boat, but they -- they made the
11  contribution.
12      Q.  And who were those board members?
13      A.  Graham Berwind, B E R W I N D, he supported
14  most of that; and Arthur Carty.  And it turned out to
15  be a very valuable thing to have the second boat out
16  there.  It saved our butt on a couple of things.
17      Q.  What was the name of the second boat?
18      A.  The VvS1.  It's a designation of a grade of
19  diamond, like the highest grade of diamond, and the
20  owner of the boat was a diamond dealer.  Strangest
21  name for a boat I ever heard.
22          (Pause in proceedings.)
23  BY MR. STUBSON:
24      Q.  Mr. Gillespie, I'm going to hand you what
25  has been marked as Deposition Exhibit Number 24, and

90

1  ask you if you recognize that document?
2      A.  Yes, I do.
3      Q.  And what is that document?
4      A.  That's TIGHAR's Form 990 for fiscal year
5  2011 to 2012.
6      Q.  And again, looking at the first page, that's
7  signed by your wife, correct?
8      A.  Yep, it looks like her signature.
9      Q.  And looking at the -- both lines 8 and 12,
10  the contributions and grants and the total revenue --
11      A.  Uh-huh.
12      Q.  -- you see that the prior year, which would
13  have been 2010 fiscal year, the grants and
14  contributions was 147,000?
15      A.  That's right.
16      Q.  And then for fiscal year 2011 it was a
17  little over 1.9 million.  Do you see that?
18      A.  That's right.
19      Q.  Okay.  And what was -- explain the big
20  increase there, if you could.
21      A.  Oh, that was -- you know, this is the
22  typical.  Before we saw a spike in contributions for
23  when -- to fund an expedition.  This -- this prior
24  year, there's no expedition, we're just struggling
25  along.  And then in 2012 we had the big -- and this

91

1  cutoff is June 30th, 2012, so that represents the
2  amount of money that had come in up to June 30th.
3  But, of course, more money came in for the 2012
4  expedition after that date, I think.  I'm not sure of
5  that.  But again, that -- that represents, primarily,
6  funding for the 2012 expedition, which was much more
7  expensive than any expedition we've ever done.
8      Q.  And that 1.9 million, that would include the
9  donation from Mr. Mellon?
10      A.  Yep.
11      Q.  And the -- had you ever had a year with
12  total revenue as high as reflected in --
13      A.  No.
14      Q.  And I'm sorry, let me -- make sure I --
15      A.  Yeah.
16      Q.  -- finish.
17      A.  Sure.
18      Q.  Did you ever have a year with higher revenue
19  than reflected in this tax return?
20          MR. CARTER:  Object to the term "revenue."
21      A.  We brought in -- TIGHAR brought in more
22  money in contributions in this fiscal year, 2011 to
23  2012, than in any previous fiscal year.
24  BY MR. STUBSON:
25      Q.  Okay.  And I do -- I think it is important

92

1  -- I mean, I'm looking at number 12, which talks
2  about total revenue.  As far as the line on -- the
3  amount on that line, had you ever reported total
4  revenue higher than is found in this particular tax
5  return?
6      A.  The two million one hundred and -- no, no, I
7  don't believe so.
8      Q.  And then looking down again under salaries
9  and other compensation, that in 2011 was 259,000.  Do
10  you see that?
11      A.  Uh-huh, yep.
12      Q.  Yes?
13      A.  Yes, that is.
14      Q.  And so there was a little bit of an increase
15  over what had been paid out in salaries in the prior
16  year, correct?
17      A.  That's right.
18          And I will emphasize that not one penny of
19  Mr. Mellon's contribution ever went into my pocket.
20  That all went to the expedition, paying Phoenix
21  International and paying the charter.
22      Q.  The amount of your salary in this fiscal
23  year, was it somewhat based on the amount of money
24  that TIGHAR was able to bring in during that year?
25      A.  Yes, of course it was.  Yes.

93

1    Q.   So bringing in higher money led to a higher
2  salary for you guys?
3    A.   That's right.
4    Q.   And just to -- again, looking at page 7,
5  which is in a different -- the page number is in a
6  little bit different place.  It's in the upper
7  right-hand corner.
8    A.   I don't have a page 7.
9         MR. CARTER:  I don't, either.
10        MR. BROWN:  I was looking for it.
11        MR. STUBSON:  Let's go off the record.
12        (Discussion off the record.)
13 BY MR. STUBSON:
14   Q.   Mr. Gillespie, I apologize, you were missing
15 page 7 of that.  You should have that in front of you
16 now, correct?
17   A.   Uh-huh, yep.
18   Q.   And then it reflects a salary to you of 186
19 for that fiscal year; is that correct?
20   A.   That's right.
21   Q.   And to the best of your knowledge, that was
22 accurate?
23   A.   As far as I know.
24   Q.   If you'll flip to the next page, or actually
25 to page 9, if you would, please.  And down at the

94

1  bottom of this are -- do you see there's a line item
2  for media rights fees?
3    A.   Yes.
4    Q.   Would that include any payments from
5  Discovery?
6    A.   Sure.
7    Q.   What other things would that include?
8    A.   As far as I know, that -- Discovery was the
9  only entity that paid a media rights fee to TIGHAR.
10   Q.   Okay.  How do you select board members?
11   A.   I don't select board members.
12   Q.   Okay.  How are they selected?
13   A.   I can nominate a board member.  If I run
14 across someone and I think, you know, I think this
15 person would do really well on our board, I bring
16 that to the board, usually in a board meeting, this
17 guy da, da, da, and the board will consider that.
18 And if they think it's worthy, they'll -- they will
19 put his name on the ballot as a candidate and will
20 hold an election.  If it gets to that point, the
21 board is going to elect them, because we discuss it.
22        Now, I -- I have suggested people as board
23 members and the board members are, no.
24   Q.   Does that happen very often?
25   A.   I think -- well, it happened once recently.

95

1  I'm hoping they at some point still go with the guy I
2  selected.  I recommended him.  The board pays
3  attention.  I do not have a free hand in running
4  TIGHAR.
5    Q.   How big is the board right now?
6    A.   Nine members -- no, eight members.  Eight
7  members.
8    Q.   And is that -- has that been its size --
9    A.   Several years.
10   Q.   Okay.
11   A.   You know, there hasn't been any turnover
12 lately.
13   Q.   And are there specific term limits for board
14 members?
15   A.   We hold elections every two years.
16   Q.   And is there a limit to how long someone can
17 serve --
18   A.   No.
19   Q.   -- on the board?
20   A.   No.
21   Q.   Who is your longest-serving board member
22 currently?
23   A.   I'm not sure.  They've all been around quite
24 awhile.
25   Q.   Okay.

96

1    A.   But I -- I -- I don't remember who came on
2  when.
3    Q.   Is there any requirement for a financial
4  commitment for folks to be on the board?
5    A.   No.  They serve as volunteers, and some --
6  some are there because of their expertise, others --
7  everybody is there because the rest of us on the
8  board feel that they bring something important to the
9  organization in terms of input, other than financial.
10 But some board members can write bigger checks than
11 other board members.
12   Q.   And -- but there's no required financial
13 commitment?
14   A.   No.
15   Q.   Okay.  So you talked about expertise.  For
16 example, Mr. Carter, what area of expertise are you
17 drawing on him being on the board?
18   A.   He holds himself out to be an attorney, and
19 I think he's a pretty darn good one.  And he's great
20 with a chain saw, too, so -- but Dr. Tom King, senior
21 archeologist, an organization like TIGHAR should have
22 an archeologist on the board.
23        Skeet Gifford, Captain Skeet Gifford,
24 retired United Airlines captain and instructor pilot
25 and NASA consultant, topnotch aviation guy on the

97

1   board. He can't write big checks, but he provides
2   important information.
3       So yeah, a variety of skills.
4   Q.   Are there any board members that you did not
5   know prior to their becoming board members of TIGHAR?
6   A.   No. No. I mean, that's almost a given.
7   The -- people become interested in the organization,
8   they join the organization, at some point I have
9   contact with them and -- or another board member has
10  contact with them and they say, hey, this guy's
11  really sharp, and how about -- how about putting this
12  person on the board. We talk about it and, if we
13  decide it's a good idea -- if everybody decides it's
14  a good idea, then we go through a nomination and
15  election process.
16  Q.   Has there been anybody put on the board over
17  your objection?
18  A.   No.
19  Q.   Is there anybody on the board that you
20  yourself did not nominate?
21  A.   I don't remember.
22  Q.   None that you can think of?
23  A.   None that I can think of.
24  Q.   How often do you conduct board meetings?
25  A.   Once a year, usually; sometimes twice a

98

1   year.
2   Q.   Are they at a standard location or do they
3   move --
4   A.   No.
5   Q.   -- around?
6   A.   No, we try to move it around, because we
7   have people scattered all over the place, so we try
8   to make it easier for them.
9   Q.   Okay. Do you hold any -- are all those
10  board meetings in person?
11  A.   Well, we've had conference calls to discuss
12  things, but I don't think we've -- we've never
13  considered any of those to be official board
14  meetings. An official board meeting is a sit-down-
15  together board meeting.
16  Q.   And that's typically once a year?
17  A.   Yeah.
18  Q.   Okay. Other than financial, are there any
19  time commitment obligations, or anything like that,
20  for board members?
21  A.   No. It's never been a problem. These guys
22  are dedicated and spend a lot of time working on
23  TIGHAR stuff.
24  Q.   Are there any decisions that are reserved
25  exclusively for the board?

99

1   A.   Any decision about any maximum amount for
2   our compensation, any -- any -- any discussions
3   involving remuneration of the executive committee,
4   which is me and Pat, are happened -- happen without
5   us being present. We don't vote on those. We leave
6   the room when those discussions are held, and any
7   decision or results of any vote are announced after
8   we come back in.
9   Q.   Okay. Any other types of decisions that
10  it's just the board?
11  A.   I want to make sure I understand your
12  question.
13  Q.   Okay.
14  A.   Does -- you're asking whether there are
15  decisions -- it's best if you restate your question.
16  Q.   Sure. Are there any other areas where the
17  decisions are reserved exclusively for the board?
18  A.   We don't accept sponsored team member unless
19  the board agrees. And the rules for accepting
20  sponsored team members, that is the people who buy
21  their way onto an expedition, the rule is that
22  anybody can propose a sponsored team member, someone
23  who says, hey, I'd like to go on a trip, but in
24  order for them to be approved, yeah, we'll take your
25  money, you can go on the trip, some board member has

100

1   to meet with them and say, yeah, this guy's all
2   right.
3   Q.   And are there -- have there been sponsored
4   team members on each of your expeditions to
5   Nikumaroro?
6   A.   Not on all of them. We started doing that
7   -- I want to say the 1999 trip was the first time we
8   had sponsored team members.
9   Q.   What's the process to apply and be approved?
10  A.   Well, you can apply by just sending me or
11  any other member of the TIGHAR board an email saying,
12  hey, I'd like to go. And we will publicize that we
13  have sponsor team member berths available, and in
14  most cases the required contribution has been
15  $50,000. And if somebody expresses an interest in
16  that, a board member meets with them, makes a
17  recommendation. And the kinds of things we're
18  looking at are is this person physically able to
19  handle the work? It's a tough place. That wasn't a
20  consideration on the 2012 trip, because we weren't
21  going to do anything but sit on the boat. The work
22  ashore is strenuous work, and we only take people who
23  seem to be fit enough to do it. But it's also a
24  personality thing. They've got to be somebody we're
25  willing to spend a month on a boat with. We're real

101

1  careful about that.
2  Q. Okay.
3  A. I have turned down sponsor team members that
4  I felt just weren't appropriate.
5  Q. And by -- did you lose their donation, then?
6  A. Yes. Oh, yeah.
7  Q. Have you done that more than a handful of
8  times or --
9  A. Just once I can remember doing it. There
10 was a guy, he was from West Virginia, he's a
11 professor at a college, and a very self-important
12 gentleman, and -- but a dedicated ham radio operator.
13 And what he really wanted to do was go out there and
14 do ham radio. He wasn't particularly interested in
15 what we were doing, but he thought it would just be a
16 really neat place to go and do ham radio. And he
17 was, by God this, that, and the other thing, and I
18 was like, I don't think so. He was just not a good
19 fit.
20 Q. SO you only remember that one time, though?
21 A. Just the one time. I wish I was inundated
22 with people who wanted to give us $50,000 to go on
23 these trips, but that's seldom the case.
24 Q. How many times -- well, let me ask this,
25 actually: What -- over the last five years what's

102

1  been the biggest disagreement between you and the
2  board?
3  A. Our senior archeologist, Tom King, and I
4  have fought from the day we met. We love each other,
5  but we fight constantly about priority. He's an
6  archeologist, I'm an aviation accident investigator.
7  He doesn't think we should even be looking for the
8  airplane. He thinks that we should be building the
9  archaeological preponderance of evidence on land; and
10 looking for the airplane is a mistake, because if you
11 don't find it, then there's the perception that it's
12 not there, not that you haven't found it yet.
13     So, you know, Tom and I go back and forth
14 all the time. Never come to blows, but -- he was on
15 our 1989, the first trip out there, and -- he wasn't
16 a board member at that time, but the disagreements
17 got enough so that he dropped off the radar. And we
18 didn't speak until shortly before the 1996 trip. He
19 wasn't along on the 1991 trip. But then he came back
20 aboard and decided we were not so bad after all, and
21 he came back aboard on the 1996 -- no, the 1997 trip.
22 And then I think it was around then that we put him
23 on the board, and he's been on the board ever since.
24 But we still disagree on things.
25     Board meetings are -- can be contentious

103

1  affairs. We argue about things. That's one of the
2  great things about the TIGHAR board. These guys are
3  fantastic.
4  Q. And ultimately making those decisions about
5  what resources are allocated to on-land searches
6  versus searches for the plane, you make those
7  decisions, correct?
8  A. Not really, no. I -- I have never, and I
9  would not ever in the board meetings say, well, I
10 know you guys think we should do this, but I am going
11 to do this. That's not the way it works. If we --
12 we have to reach consensus on what we're going to go
13 next and how the resources are -- not dollar per
14 dollar how they are going to be allotted next, but
15 where we're going to put our energies and money
16 available to us. Now, that's a -- the board has to
17 be onboard with all that.
18 Q. And so if a particular avenue of
19 investigation does not have consensus, it won't be
20 undertaken?
21 A. I can't -- I have to have the board's
22 support for what we do.
23 Q. How many times has TIGHAR been -- and you
24 should correct me if I'm mispronouncing the name of
25 the island. Nikumaroro?

104

1  A. That's great.
2  Q. How many times has TIGHAR been there?
3  A. How many times has TIGHAR been there? 11.
4  Q. And have you been on each of those?
5  A. No. There was one that I didn't go on. It
6  was 2003. It was a very specific -- one of the guys
7  on the New England Aquarium -- on the New England
8  Aquarium expedition, Dr. Greg Stone, when they were
9  there in 2002 he thought that he saw something on the
10 reef near the main pass in shallow water that looked
11 to him like an airplane wheel. Not the tire, but the
12 metal part, the wheel. And he didn't mention this
13 until they were already on their way home. He
14 assumed that we had seen it. You know, they -- we
15 share all this back and forth when we go to that
16 island. And he got back and said I saw something, a
17 wheel.
18     What do you mean, you saw a wheel?
19     And we met, we went up to the New England
20 Air Museum, we looked at airplane wheels, and he
21 said, yeah, it looks like one of those. They were
22 Lockheed Electras.
23     So we decided we needed to have a dedicated
24 expedition to go out there and get that wheel, and it
25 had to happen fast and it had to happen cheap,

105

1  because we didn't have the money.  So we chartered a
2  small sailboat out of New Zealand and sent four guys
3  out there, John Clauss, Walt Holm, Van Hunt and
4  somebody else, I've forgotten who.  And they went out
5  there, they were only on the island for like four
6  days, and the wheel was gone.  There had been a huge
7  storm at the island, it over washed stuff; but they
8  found some other stuff on land that was really
9  interesting.
10          But I wasn't on that trip, to get to your
11  point.  The other ten trips I have been on, I have
12  led.
13      Q.   And the first one was when?
14      A.   '89.
15      Q.   Okay.  And they -- the most recent one prior
16  to the 2010 expedition was when?
17      A.   Prior to 2010?
18      Q.   Yeah.
19      A.   Was 2007, yeah.
20      Q.   Okay.  During any of those prior expeditions
21  before 2010, had there been utilization of
22  remote-operated underwater vehicles?
23      A.   Yeah.  Yeah.
24      Q.   Tell me about those.
25      A.   1991 we contracted with Oceaneering

106

1  International, a large undersea search and recovery,
2  to do a sonar survey around the whole island.  And
3  the ship we chartered -- we had to take a ship out of
4  a location where we could Fed Ex a winch, a
5  7,000-thousand pound winch, and then load it on the
6  boat.  Well, that was Hawaii, and we got a ship that
7  was in Hawaii, a 120-foot motor vessel Acadian.  And
8  we got the winch out there, got it welded to the top
9  deck, made the boat horribly unstable, and we went
10  down there and they did their sonar survey.
11          And they went around the whole island towing
12  -- this was towed array side scan sonar.  They went
13  all around the island except the western end.  That
14  was the last part they were going to do.  And as they
15  came up to do the western end of the island, they ran
16  the fish, as you call it, the towed array sonar, they
17  ran the fish into an underwater obstruction and lost
18  the fish.
19          Now, years later it turns out that western
20  end is exactly where we think the airplane is.  We
21  didn't get to search what later turned out to be the
22  prime search area.
23          But yeah, we did.  We were towing sonar, we
24  were analyzing side scan sonar video.  There was no
25  video imagery.  It was printout and computer screen

107

1  and side scan sonar stuff.
2          And we saw some things that looked
3  interesting, like, hey, that might be an airplane
4  part.  And when we towed over it in a different
5  direction, it was all just, no, it's not.  We didn't
6  find anything, but we didn't get to search the
7  western end.
8      Q.   And the contractor was Oceaneering?
9      A.   Oceaneering International.
10      Q.   Okay.
11      A.   The interesting thing there is that the
12  regional manager we were dealing with at Oceaneering
13  International at that time was a man named Michael
14  Kutzleb, K U T Z L E B, Kutzleb.  And fast forward to
15  2012, and I'm suddenly under pressure from the
16  U.S. State Department to do the expedition "this
17  summer."  We weren't planning to do the expedition
18  "this summer."  We wanted more time to prepare for
19  this trip.  And -- but the State Department says
20  we'll give you all kinds of publicity and what
21  support we can and help you round up sponsors, but
22  it's got to happen this summer.
23          Oh, man, who can I call?  What's Kutzleb
24  doing these days?  Is he still with Oceaneering?  No,
25  he's not at Oceaneering.  He's running his own

108

1  company, Phoenix International.
2          So I called Mike.  Oh, Ric, how's it going?
3  Yeah, it's been years.  You know, let's -- come out.
4          I want to -- I've got to talk to you, Mike,
5  about -- about another job.
6          And that's where we connected with Phoenix
7  International, because I knew Mike Kutzleb, liked
8  him, and we had to put together this 2012 trip in a
9  big hurry.
10          And if I had it to do all over again, I
11  would not do it.
12      Q.   The 2012 trip?
13      A.   If I had to do it over again, I would have
14  told the State Department that we don't -- do you
15  want it right or do you want it this summer, because
16  you can't have both.  But when the Assistant
17  Secretary of State tells you we've looked at all your
18  data, we think you've got this thing nailed, and want
19  you to do this expedition this summer, and my
20  Secretary is so excited about this that she wants to
21  make the announcement herself at an event here at the
22  State Department.
23          To which I react, what do you mean your
24  Secretary?  Wait a minute, what Secretary are you
25  talking about?

109

1      He says, the one I work for.

2      At that point everything gets surreal, you

3   know, and I'm being offered the Secretary of State,

4   Secretary of Transportation, Bob Ballard, Benjamin

5   Franklin Room at the State Department.  You don't say

6   no to something -- well, I didn't.  I would today,

7   but I didn't then.

8      And the board of directors said, oh, my God,

9   this is awesome, this is great, but we've got to get

10   this thing thrown together.

11      And so we do the event on March 20th.  We

12   get tremendous press from it.  We even got covered in

13   the Casper Tribune.  And two days later we get an

14   email at the info@tighar address.  It come to my wife

15   Pat; it didn't come to me.  She forwarded it to me,

16   said a Mr. Mellon wants you to call him.

17      I said, all right, give me the phone number.

18      But he said it's easiest to catch him on the

19   weekend, and it's like a Wednesday, or something,

20   whatever the 22nd was.  And I think it was on a

21   Saturday I called up, this is the first time I ever

22   talked to Mr. Mellon, and said, I understand that

23   you're looking -- you're interested in funding

24   opportunity for the Earhart Project.

25      Yes.

110

1      I believe at that time he said and I'd be

2   interested in participating in the expedition.

3      I said, well, you understand that that's

4   what we call a sponsor team member and it usually

5   involves a substantial contribution.

6      I get calls from people all the time wanting

7   to go look for Amelia Earhart, wanting to volunteer,

8   make a contribution, go on the expedition.

9      It usually requires a substantial

10   contribution.  What amount did you have in mind?

11      Well, what's your budget?

12      I said, well, right now it's looking like

13   about $2 million.

14      I'd do half.

15      You know, my jaw hit the floor.  And from

16   that point on I was, okay, all right, I can at least

17   send him some information.  So I wrote him the letter

18   that we now have that's an exhibit, I sent him all

19   the information I could think of, and within eight

20   days we had -- on March 30th we had stock that we

21   could sell.

22      And we were -- I was trying -- I need to

23   meet the guy in person, he's a sponsor team member,

24   he wants to go on the trip, I have to meet him in

25   person, who am I dealing with here?  And we thought

111

1   we had a trip -- he was going to fly down to

2   Wilmington, but that didn't work out, somebody's

3   schedule, I forgot the details.

4      So I said, all right, I'll come up to

5   Rhode Island.

6      Because at that time all of my communication

7   with him was at the house in Rhode Island and then he

8   was at the farm in Connecticut.  I didn't even know

9   he had a Wyoming address until much, much, later.

10      And so it was April 28th, almost a month

11   after -- no, over a month after our first

12   communication and almost a month after we actually

13   had his money in hand, that we went to lunch together

14   in Providence, Rhode Island.  I flew up on the

15   airline, he picked me up in his truck, he drove over

16   from the farm in Connecticut, and we talked about the

17   project, what we were going to do.

18      But that's how all that happened.

19      Q.   Who paid for the lunch in Rhode Island?

20      A.   I think Mr. Mellon did.  I probably offered,

21   but I don't remember.

22      Q.   And he still -- what -- you're confident

23   that that's the right date?

24      A.   Oh, yeah.

25      Q.   And do you have your airline ticket for

112

1   that?

2      A.   I'm sure we have those records, sure, yeah.

3      Q.   And what else makes you confident that

4   that's the right date, the April 18th (sic) date?

5      A.   Well, I mean, it has been part of the --

6   especially ever since the Complaint was filed, it's

7   -- it's a -- it's rather an amazing thing and worth

8   talking about when things come up in conversation.

9      You got a million dollar contribution?

10      Yeah.

11      Wow, what did you have to do to get that?

12      Not much.

13      You know, we didn't ask for it, we didn't

14   solicit it.  Somebody we never -- this never happens

15   to us.  People who make large contributions to TIGHAR

16   projects are people who have been associated with us,

17   usually for years, have often been to field school or

18   to other TIGHAR events.  You don't build that kind of

19   confidence with people unless they've been exposed to

20   you for awhile.  So when somebody gives you more

21   money than any individual has ever given you before,

22   and does it like snapping their fingers, within eight

23   days of them coming out of the woodwork, you've never

24   heard of them, you talk about that.  I didn't even

25   lay eyes on the guy until almost a month after his

113

1  money was in our account.  I mean, I -- this is
2  amazing.  So when something that amazing happens, you
3  talk about it.  There's lots and lots -- it becomes
4  part of the TIGHAR, what would you call it, our
5  corporate -- I'm at a loss for words but, you know,
6  our -- the whole TIGHAR legacy, the whole story of
7  the quest, yeah.
8     Q.  The -- I asked you about underwater searches
9  conducted by TIGHAR, and you mentioned the 1991
10 expedition.  Were there any other underwater searches
11 after -- between 1991 and 2010?
12    A.  No.  No.
13    Q.  Okay.
14    A.  We could never afford it.
15    Q.  Okay.  So as far as remote devices or
16 equipment, that was the last time until 2010 that you
17 had utilized that?
18    A.  For underwater, yeah.  We had scuba divers
19 in the water on several expeditions; but the whole
20 process was we can't afford to -- you -- to solve the
21 Earhart mystery, you have to have a smoking gun.
22 You've got to have something.  We call it the any
23 idiot artifact.  It can't be complicated.  It's got
24 to be very simple.  You have to be able to show it up
25 to the public, say look, any idiot can see what this

114

1  is.  You can't do that with freckle cream jars and
2  little artifacts down at the Seven Site.  As
3  convincing as those might be to an archeologist, the
4  public wants something simple.  And so we -- to --
5  that's going to be DNA or identifiable airplane
6  wreckage.  Something with a serial number, a part
7  number, something that's incontrovertible --
8  incontrovertibly has to be from Earhart's airplane.
9         Well, searches -- there might be DNA on land
10 if we can find bones, or even maybe contact DNA from
11 touching something.  And I can put a team of 15
12 people on that island for three weeks for roughly
13 $300,000, so we can try to do that.  And if we get --
14 the objective being to build up enough good evidence,
15 find enough stuff and find real evidence, build a
16 strong enough case so that we can then raise the
17 money to do the expensive stuff and look for the
18 airplane.  That was always the plan.
19        And actually, as it turned out, it wasn't
20 all the other little stuff that we have found, as
21 convincing as it is for us, it was the Bevington
22 photo that -- that -- that tipped the scales there.
23 And it was the Bevington photo not because of what
24 Jeff Glickman said, it was because the Assistant
25 Secretary of State Kurt Campbell asked me what can we

115

1  do to help you find Amelia?
2         And I said, our forensic imaging guy has
3  been working on this old photograph.  He thinks he
4  sees something that is consistent with the wreckage
5  of the Earhart landing gear, and he's more -- he's
6  surer of that than anything I've ever known him to be
7  sure about.  I've worked with him for a long time.
8  But, you know, this has the potential of being really
9  huge, so I need a second opinion.  I need an opinion
10 from unimpeachable experts who don't have a dog in
11 the fight.  So I want U.S. Government photo analysts
12 to look at this.
13        And he says, I think I can arrange that.
14        And he did.
15        And I delivered the imagery to the Bureau of
16 Intelligence Services.  They had it for a number of
17 months, called me in for a briefing, said we've looked
18 at the imagery, we've done our own research, and we
19 pretty much agree with your guy, this could very well
20 be Amelia -- a Lockheed Electra wreckage.  We can't
21 say -- we can't confirm it.  They said in our
22 business there's possible, probable, and confirmed,
23 and we're somewhere in the probable on this.
24 I said, okay, can I quote you on this?  Are you going
25 to give me a written report?

116

1         He laughed.  He said, if the guys I really
2  work for knew I was even working on this, I'd be in
3  trouble.  He said no, this is something we did as a
4  favor to the Assistant Secretary, he wanted us to
5  give you this information, so you can't talk about
6  this.
7         And it was Campbell himself who released the
8  information later that -- he probably pissed off the
9  guys, the Intelligence guys, by talking about it.
10        But yeah, that's -- and that's -- that's
11 what -- when Campbell knew that his own guys had
12 verified the Bevington object, that's what prompted
13 him to call me in and say, look, we want to have a
14 big event.  We want you to do this "this summer."
15 And it's not hard to figure out why they had to have
16 it done "this summer," because they knew they
17 wouldn't be there the next summer.  Because even if
18 Obama won the election, Clinton was going to step
19 down as Secretary of State, she was going to take all
20 her people with her, they are all Clinton employees,
21 so if this was going to happen, it had to happen on
22 their watch and it had to happen that summer.
23    Q.  You said scuba divers had been used
24 previously.  How deep have you explored with scuba
25 divers?

117

1    A.    We set rules that you don't go below a
2  hundred feet.  And generally speaking, the teams have
3  respected that.  In 1989 we had a bunch of cowboys
4  out there, and I found out later that a couple of
5  them had gone to like 260 feet, which is insane.
6  They didn't tell me about it until I got back and
7  reviewed the dive logs.  There's no hyperbaric
8  chamber, there's no support out there, but -- and the
9  reason they were going down there was to get black
10  coral, which is really valuable.  They didn't go on
11  any more expeditions.  But that's -- generally
12  speaking, we kept it to about a hundred feet.
13    Q.    Why did you make the determination to use
14  underwater vehicles in 2010?
15    A.    So I met with Mike Kutzleb, my old buddy
16  Mike.  Look, we've got to search this reef, and we're
17  looking for airplane parts.  And we were out there in
18  2010, we had a little --
19    Q.    Let me clarify.  I'm asking about 2010.
20    A.    Oh, you're asking about 2010?
21    Q.    Yeah.
22    A.    I'm sorry.
23    Q.    And the determination to --
24    A.    To use --
25    Q.    -- use an ROV --

118

1    A.    Okay.
2    Q.    -- in 2010.
3    A.    Okay, all right.
4  We were putting together the 2010 trip.
5  There was -- the main focus of the 2010 trip was
6  going to be working the Seven Site.
7           (Mr. Mellon not present.)
8           MR. CARTER:  Let's go off the record for a
9  second.
10          (Discussion off the record.)
11          (Mr. Mellon present.)
12  BY MR. STUBSON:
13    Q.    Go on.  What was the last question?
14    A.    What made us decide to use remote vehicles
15  in 2010.
16          Are we back on the record?
17    Q.    Yes.
18    A.    Okay.  Yeah, we were putting together this
19  expedition, and the primary focus was the Seven Site,
20  archaeology there.  We looked at that site in 2001
21  and 2007 finding good stuff.  We really wanted to
22  really hit it in 2010.
23          And somebody, and I think it was Clauss,
24  John Clauss, said hey, I've got a friend, Jesse
25  Rodocker down at SeaBotix I've been talking to, and

119

1  he's got this great little ROV, and we can
2  probably get it cheap and we can do some underwater
3  searches.
4           Well, you know, where are they?  Well, sure,
5  why not.  Let me talk to him.
6           And I talk to Jesse.  And I wasn't -- we're
7  not just going to rent your -- it's called the LBV,
8  Little Benthic Vehicle.  We're not just going to rent
9  your LBV because we don't know how to run it.  We
10  need somebody -- we made that mistake before.  You
11  take technology out there and try to learn to run it
12  on your own and do on-the-job training, and it just
13  doesn't work out well.  So I said, we're going to
14  need you to come along and fly the thing yourself.
15  Have you done underwater?
16           Oh, yeah, we do underwater searches all the
17  time.  If it's there, man, I'll find it.  This
18  vehicle is great.
19           Good, I'll have John and Walt Holm work with
20  you and they can help you handle tether and it will
21  be fine.
22    Q.    Did he give you any examples of prior
23  underwater searches that he had --
24    A.    I don't remember.  He probably did.  I would
25  have to look back through.

120

1           But we -- but I think the total cost of
2  renting the thing -- and he would come along and not
3  charge us for his time to do it.  If we rented the
4  vehicle, he'd come along and not charge us for his
5  time, we would just pay his airline expenses, and run
6  the vehicle for us.  And it was like $32,000, or
7  something like that, ballpark, to do the whole thing.
8           So here we have an affordable way to do some
9  underwater search of the reef.  Sure, why not?  Good.
10          And it turned out, as these things usually
11  do, he gets out there -- he had two tethers with him,
12  a 300-meter tether -- this is fiberoptic cable -- a
13  300-meter tether and a 150-meter tether.  And he got
14  out there and within two days the 300-meter tether
15  went bad, and so we're stuck with only searching to
16  150 meters until the second week.  We send word back,
17  hey, we've got a bad tether.  Bring us another
18  tether.  Because we've got the second boat coming out
19  with Carty.
20          So they bring us a second longer tether, so
21  we were able to do some deeper work later in the
22  trip.  And it was during that second episode of deep
23  searching with the longer tether, I think it was, I
24  want to say, July 7th -- June 7th?  Maybe June.  It
25  was a May-June trip, so June 7th?  Anyway, it was on

121

1  the 7th that two things happened.  They -- they ran
2  the cable for the ROV through the propeller of the
3  boat they were using, they were operating off of VvS1
4  at that time, and they damaged the system on the ROV
5  that tells the control station where the ROV is.
6  It's an acoustic ranging system.  It sends out a ping
7  that says I'm here, where are you?  I'm here, where
8  are you?  Ping, ping, ping.  Well, that system got
9  trashed.  So at that point you send the ROV out,
10  you're watching it, what it's seeing in the video,
11  but -- and you know it's in the general direction,
12  but you don't know where it is.
13     Q.   That acoustic ranging system, was that --
14  could you get an exact location on the ROV based on
15  that?
16     A.   Well, okay.  It wasn't -- well, it turned
17  out to be screwed up.  Because later, after the
18  expedition, Jesse gave us a report of where they had
19  searched.  And the -- a little map with borders
20  saying we covered this area to this depth.  And he
21  was using all the points from that acoustic ranging
22  system to determine that while it was still working.
23          And I looked at that and looked at what they
24  were doing, and said something's wrong here.  And I
25  communicated with Jesse.  I says, your -- your

122

1  program that you were using to translate the data
2  from the acoustic ranging system to the physical
3  plotting, there's something wrong.  Because where you
4  say you have a known data point here that's
5  specifically the propeller shaft of the Norwich City,
6  you say it's here, and it's not here.  It's up here.
7  So something's messed up.
8          And he looked into it and he under- -- he
9  eventually -- ended up meeting with the software
10  programmer for that system in the UK, and yeah,
11  there's a problem with it.  It screwed up.
12     Q.   And your determination that it was -- it
13  wasn't accurate, even when it was working, that was
14  made after the --
15     A.   Yeah, that was made after the trip.  It was
16  like several months after as I was going back through
17  and reviewing all the data that we collected.
18          But while we were out there -- so it was on
19  the same day that the ranging system got trashed that
20  the now infamous wire and rope video was shot.  And I
21  wasn't aboard VvS1 when that happened.  I was on the
22  island.  I was gone to the Seven Site probably taking
23  a nap.  And we got back at the end of the day and,
24  hey, how did it go with the ROV?
25          Well, the bad news is that it's -- we lost

123

1  the acoustic ranging system; but the good news is
2  that we saw some manmade objects.
3          What did you see?
4          Well, there's a rope and what kind of looks
5  like a wire.
6          Okay.
7          And this is the first manmade stuff we'd
8  seen.
9          All right, let's take a look at it.
10          And we pulled it up on the monitor that
11  evening on the ship.  And the Discovery film crew was
12  there shooting this whole thing.  As a matter of fact,
13  they used that in the Discovery show, and it's --
14  it's now on YouTube.  That segment is also on the DVD
15  that I sent Mr. Mellon after his first phone call.
16          But anyway, so we're there looking at this
17  wire, this rope and wire.  And the rope is rope, you
18  know.  It's -- rope doesn't help us, because there's
19  no way to tell what kind of rope it is.  But this
20  wire thing is really kind of weird.  It might be whip
21  coral, it might be wire.  And the -- we're standing
22  there talking about it and --
23     Q.   And when you say "we," who is we?
24     A.   Oh, Mark Smith, Jesse Rodocker, John Clauss,
25  I think Art Carty was there.  It's not hard to

124

1  complete the list because you can watch the video of
2  who's standing there with us looking at this thing.
3  I've forgotten all the names of who happened to be
4  there, but there was a gang of us standing around
5  this.  And we're looking at this and somebody asks
6  the question, well, is it worth recovery?  Should we
7  go back after it?
8          And I stood there, and this is on the tape,
9  I said, let's go get it.  We need to find it.
10          All right, tomorrow we will go relocate it
11  and find it.
12          But they couldn't because -- they tried,
13  they tried and tried, and they couldn't re-find the
14  thing.
15          Totally opposite from Mr. Mellon's
16  impression, that he said it blew his mind that we
17  didn't go look for it.  We absolutely did go look for
18  it.  It's right on the tape that I said let's go get
19  it.  We wanted to know what that thing was.
20     Q.   What information on the location of the ROV
21  did you did you have at the time that it came across
22  the --
23     A.   Well, we knew where VvS1 was from the GPS
24  aboard VvS1, and we know -- we know how long the
25  cable was, and we know the ROV is out there.  That's

125

1  about it.

2  **Q.**  But do you know -- I mean, do you know

3  whether it was at the -- at what depth?

4  **A.**  **Depth?**

5  **Q.**  Depth.

6  **A.**  **Depth information we've got, because there's**

7  **depth information on the heads-up display of the**

8  **standard definition video.  So yeah, assuming the**

9  **depth information is accurate, you know, we know the**

10  **depth.**

11  **Q.**  Do you know whether the depth information

12  was accurate?

13  **A.**  **I have no way of knowing whether it's**

14  **accurate.**

15  **Q.**  And the rest of the information you got was

16  inaccurate?

17  **A.**  **Yeah.**

18  **Q.**  The -- and so I understand how you may have

19  an idea kind on the outside edge the range of the

20  tether, but could you tell how far out that tether is

21  at the --

22  **A.**  **Well, if -- if you have depth information**

23  **and you have good information about how the reef**

24  **slope goes, then you have some idea of how far out**

25  **from the reef edge you must be if you're that deep.**

126

1  **But it's all pretty fuzzy.**

2  **Q.**  How long did they look for it the next day?

3  **A.**  **I'd have to look at the notes, the notes are**

4  **in the stuff we submitted with discovery, but at**

5  **least a couple hours, and maybe more.  It was the**

6  **only thing we had seen out there that was vaguely**

7  **interesting.  And believe me, we took that -- that --**

8  **the rope was the first thing in that clip, and we**

9  **watched that clip, so -- you can see the**

10  **wire-maybe-thing, and everybody, including Jesse**

11  **Rodocker, John Clauss, me, everybody out there is**

12  **peering at this stuff.  And we'd been watching other**

13  **video taken underwater for the last week, and nothing**

14  **looked any different to us.  And when you get to the**

15  **wire, yeah, let's go get that.  I wanted that damn**

16  **wire, but we couldn't get it.**

17  **Q.**  So other than price, other than being able

18  to get this ROV at a pretty decent price, what else

19  factored into your decision to actually utilize an

20  underwater -- underwater exploration in 2010?

21  **A.**  **We'd been wanting to do underwater**

22  **exploration for a long time, and this was the first**

23  **time we had something that was at a price we could**

24  **afford.  So why not?  Give it a shot.**

25  **Q.**  Sort of as an aside, what's the Earhart

127

1  Project Advisory Committee?

2  **A.**  **Oh, back on one of the original forums, the**

3  **listserv forum, which was open to anybody who wanted**

4  **to participate, there were a number of people, just**

5  **watching postings, that impressed me with their**

6  **credentials or their acumen or -- just sharp people.**

7  **And I decided that to cut through a lot of the dumb**

8  **chatter on -- and move the research forward, I would**

9  **handpick, I'd like you to be part of this council,**

10  **I'd like you, you, and we started building this**

11  **separate group.  And we would have -- and we called**

12  **it the Earhart Project Advisory Council, EPAK.**

13  **And we would occasionally have physical**

14  **meetings, and they all got along great together, and**

15  **it became really quite a good -- great research**

16  **group.  Boy, they could -- you'd like -- you'd send**

17  **them a task and they would go out -- you'd say, I**

18  **need to know what women's compacts in the 1930s**

19  **looked like, which ones had a quarter-inch bevel on**

20  **the glass in the mirror, and they would go out and**

21  **they would go on eBay and they would contact groups**

22  **that collect compacts, and they would come back and**

23  **help us identify artifacts.  Just a tremendously**

24  **powerful group.**

25  **But little bit by little bit it was replaced**

128

1  **by the current online forum, and it -- it kind of**

2  **withered away as the current online forum grew in**

3  **capability.**

4  **Q.**  At what point did it cease to exist?

5  **A.**  **Well, this would have been in the -- the old**

6  **EPAC kind of withered away I want to say in the**

7  **spring of 2012, because there was a big dispute**

8  **between me and Tom King about whether we should be**

9  **looking for the airplane.  Here we've got this, hey,**

10  **we're going to go search for this airplane, a big --**

11  **a very high-profile thing.**

12  **And Tom is saying, oh, man, this is a huge**

13  **mistake.  We shouldn't be doing this.**

14  **And he's posted on his private blog that we**

15  **shouldn't be doing it.**

16  **Oh, God, we've got a board member posting**

17  **that we shouldn't be doing this at all.  Oh, shit.**

18  **And Tom and I have fought for years and**

19  **years.  And what he does is try to gather followers**

20  **and then I get an email, several of us feel that --**

21  **You know, come on, we're not going to -- if**

22  **-- they can speak for themselves.**

23  **Just the usual in-fighting you get with any**

24  **group.  And the old EPAC kind of dissolved in that**

25  **kind of nonsense.**

141

1  on your work?
2         And I worked with them and we put together a
3  piece that they put out on their website.  And that
4  piece got more hits than they had ever gotten on any
5  story on their website ever.  And when they saw that,
6  they handed that to their TV production department
7  and said, you know, this is something you might want
8  to pay attention to.
9         So then I got a call from Discovery
10  television saying, hey, we'd like to talk to you guys
11  about a documentary.
12         We've been trying to get your attention for
13  some time.
14    Q.   About, approximately, when was this phone
15  call?
16    A.   This would be in the summer of 2009.
17    Q.   Okay.
18    A.   And yeah, we'd like to talk about a
19  documentary.
20         So we set up a meeting in Silver Hill (sic),
21  Maryland, where Discovery Communications'
22  headquarters is, with their head of -- head of
23  specials.  Christine Weber is her name.  And I was
24  there, I think Mr. Carter was there, and we went to
25  lunch and we talked about the expedition we were

142

1  planning, and the show -- what kind show they might
2  be interested in doing.
3         And they said, well, the show we want to do
4  is not just about this expedition, but about TIGHAR's
5  entire quest for Amelia Earhart.  Do you have footage
6  that we can use in this?
7         Yeah, we've been taking video going back to
8  our very first trip.  We've got lots and lots of
9  videotapes.  Some of it's amateur shots, some of it's
10  professional shots, but the whole thing is
11  documented.
12         Okay, well, we want some of those.
13         Well, how long?  Are you talking about a
14  one-hour show or a segment of a one-hour show or
15  maybe a longer show?
16         The more we talked, Chris Weber said, I
17  think we're looking at a two-hour special.
18         That's a lot of footage, and you'd need to
19  license that footage from us.
20         They said, yeah, we understand that.
21         Okay.
22         So we suggested that they give us a proposal
23  for exclusive media coverage, and they did.  And they
24  wanted to pay us I think $65,000, and we said no, I
25  think it's got to be worth a little more than that.

143

1  And we started negotiating, and to make a
2  six-month-long story short, they ended up paying us
3  $500,000 for the license, which was a big chunk of
4  that expedition.
5         And they ended up producing a two-hour show
6  that is, I think, really quite good.  And it used a
7  lot of our footage.  Of course, we had a period
8  of exclusivity where we couldn't work with anybody
9  else on a television show for some period of time
10  after that.
11    Q.   Do you remember how long that was?
12    A.   Yeah, I do, because we got it renewed.  They
13  also did the same deal on the 2012 trip, although for
14  nothing like that amount of money.  They paid
15  $100,000 for the rights in 2012, plus they made a
16  $100,000 straight contribution to TIGHAR.  So we got
17  a total of $200,000 from them for that.  But we
18  extended the original contract.  It expires April
19  11th of this year, ten days from now.  And then
20  that's when this exclusivity period ends.  So we'll
21  be free to discuss and make deals with other media
22  about our other expedition if anybody wants to do
23  that.
24    Q.   What do you -- as far as when you do
25  fund-raising, do you look for a certain percentage of

144

1  that from sponsorships, or just as much as you can
2  get?  I mean, do you have a breakdown on what your
3  target is as far as your fund-raising on --
4    A.   No, we -- we decide what's it going to cost
5  -- we -- we use a build-it-and-they-will-come
6  philosophy.  We build the expedition we feel needs to
7  be done, and then we figure out how much that's going
8  to cost, and then we make known to the public what we
9  want to do, how we want to do it, and how much it's
10  going to cost, and we're not going to be able to do
11  it if we don't raise the money.  And then we usually
12  stand by and let people come to us.  I have found
13  repeatedly that just trying to identify wealthy
14  companies or people who don't have any known
15  particular interest in this and just going through a
16  cold call and saying, hey, we're going to go look for
17  Amelia Earhart, do you want to send us money, that
18  doesn't work.
19    Q.   You've tried that method, though, before?
20    A.   Years ago I -- I spent a lot of time writing
21  proposals to companies I never heard from, back from.
22  But what we found is that if you make the need known,
23  if you have a good reputation, people look into it
24  and say these guys seem like the real deal, and
25  people come to you and say, you know, I might like

145

1  to help out, and we talk about it and put it
2  together.
3      Q.   And so the publicity aspect of putting out
4  that you're going to do in an expedition and what you
5  intend to do, that's a big apart of your
6  fund-raising?
7      A.   It's huge, right.
8      Q.   And you really depend upon that and count on
9  that for bringing donors to you?
10     A.   Yeah, we do.
11     Q.   And you intend for donors to rely upon those
12 statements that you're making in the public
13 announcements and that publicity?
14     A.   Of course.
15     Q.   The -- other than Discovery, who else did
16 you talk to about sponsoring the 2010 expedition?
17     A.   The 2010 expedition?  Well, of course, the
18 board members are major contributors.
19     Q.   And let me back up.  One question I didn't
20 ask, how -- do you remember how much your budget was
21 for 2010?
22     A.   No.  I would have to go back and check, but
23 it was -- it was pushing a million dollars, yeah.
24     Q.   In that area?
25     A.   In that -- that general area, yeah.  Yeah.

146

1      Q.   Okay.  Anybody else other than sponsors and
2  Discovery that you were --
3      A.   Well, as I recall, as part of our
4  disclosures there was like a request for a whole list
5  of sponsors, and I think we gave you all that.  I
6  don't remember it, but -- I don't remember the
7  amount, but I know you have that information.
8      Q.   Was -- was Discovery responsible for the
9  biggest share of the funding of that?
10     A.   The biggest single chunk, oh, yeah.
11     Q.   I'm going to hand you what's been marked as
12 Deposition Exhibit Number 27.  Do you recognize that
13 document?
14     A.   Uh-huh.
15     Q.   And what is that?
16     A.   It looks like the minutes of our February
17 19, 2010 board meeting.
18     Q.   Okay.  And I note that also attending that
19 were Mark Smith and Stephanie Daniels of --
20     A.   Yes.
21     Q.   -- 07 Films; is that correct?
22     A.   Stephanie is Mark's wife, yeah.
23     Q.   Okay.  Okay.  And why were they attending
24 the meeting?
25     A.   Because we were going to -- there was a big

147

1  discussion with Discovery about using Mark Smith.  We
2  -- we have a contract with Mark Smith that he gets
3  the exclusive use of TIGHAR video resources for the
4  production of documentaries, and that any -- and any
5  filming of TIGHAR activity for television will be
6  done by 07 Films.  And when -- when we were cutting
7  our deal with Discovery, they wanted to use their own
8  production company to shoot video, and we said no,
9  we've got to use Mark.  We have a contract with Mark,
10 we have to honor our contract.  We've got to use
11 Mark.  And we negotiated a compromise where we used
12 Mark -- they used Mark as one of their photographers,
13 but they also had their own cameraman aboard, also.
14 But -- so Mark was very much a part of the planning
15 for that expedition, and that's why Mark and
16 Stephanie were there at the board meeting.
17     Q.   Okay.  And if you look at the second page of
18 those minutes -- and by the way, who keeps the
19 meeting minutes?
20     A.   My wife.
21     Q.   Okay.  And do you -- is it your standard
22 practice to review those and have those approved at
23 the following board meeting?
24     A.   Absolutely.
25     Q.   And so these would have been --

148

1      A.   Yeah.
2      Q.   -- the minutes, then, that would have been
3  subsequently approved by the board?
4      A.   Yes.
5      Q.   Looking at that -- under, it says, Niku VI
6  Expedition --
7      A.   Yeah.
8      Q.   -- do you see that paragraph?
9      A.   Yeah.
10     Q.   And there's a sentence there that says:
11 Completing the funding for the expedition relies upon
12 a successful and lucrative contract with Discovery.
13          Do you see that?
14     A.   Yes.
15     Q.   And that was accurate?
16     A.   Yeah.
17     Q.   And without -- is it fair to say that
18 without getting Discovery on board at that time, you
19 wouldn't have been able to do an expedition?
20     A.   Probably not.
21     Q.   Mr. Gillespie, I'm handing you Deposition
22 Exhibit Number 28 --
23     A.   Uh-huh.
24     Q.   -- and ask you if you recognize that
25 document?

153

1    Q.   Okay.  They were relying on you guys to do
2  that?
3    A.   Yeah.
4    Q.   Okay.  Was there anybody else during the
5  2010 expedition that would have had contractual
6  rights to the results of the expedition other than
7  Discovery?
8    A.   No.
9    Q.   Do you -- for Earhart artifacts, do you have
10  any arrangement right now with a museum, or anybody
11  else, on how to display artifacts when they are
12  found?
13    A.   We have an understanding with the Republic
14  of Kiribati that in conducting our research within
15  the borders of Kiribati, that we can collect anything
16  that we find interesting for research purposes, but
17  it's still owned by Kiribati and its ultimate
18  disposition is up to Kiribati.  We can make
19  recommendations, but it's -- it's their stuff and
20  they get to say what happens to it.
21    Q.   And that agreement was not in place in 2010,
22  correct?
23    A.   No, that -- that -- that understanding has
24  been in place since 1989.  The agreement that was
25  signed March 20th, 2012 was the agreement between

154

1  TIGHAR and the Republic of Kiribati that makes us
2  their exclusive agent for investigations of the
3  Earhart disappearance within the national borders of
4  Kiribati.  That's something we did to protect the
5  site, so that as -- as our information and evidence
6  built and there was more and more acceptance that
7  this may, in fact, be what happened to Amelia
8  Earhart, we were very concerned and felt -- and
9  especially concerned in the event that we did make a
10  discovery.
11       And Discovery, under their contract they
12  say, yeah, it's there and here's the pictures of it,
13  and then when you leave and you worry about pirates.
14  I mean, there's a perception, and I think it's a
15  correct one, that the actual wreckage of the Earhart
16  aircraft and, say, a traveling museum display, is
17  worth a lot of money.  And we pointed out to Kiribati
18  it's worth a lot of money to you guys, and you're a
19  country that desperately needs money, and we want to
20  help you with that.  We want to protect the site and
21  we want to share with you in that putting together a
22  traveling exhibit, if and when we have a conclusive
23  answer to the mystery.
24    Q.   The understanding that you say goes back to
25  1989, is that in writing anywhere?

155

1    A.   Yeah, I think on one of the early artifact
2  inventories there's a -- there is some mention of
3  that.  I would have to dig back through and check.
4    Q.   How long back do you think that would have
5  been?
6    A.   Well, I think it goes back to either '89 or
7  '91.  Certainly, early on in the project.  Because
8  you just can't go onto somebody else's island and
9  take stuff.  I mean, we -- we always have a Kiribati
10  representative with us aboard the boat, and we work
11  very closely, and always have, with the Kiribati
12  government.
13       MR. STUBSON:  And Mr. Masterson and
14  Mr. Carter, I'll try to remember to follow up in
15  writing, but that's something that we would like to
16  have you produce as part of discovery, and I mean the
17  written understanding with Kiribati.
18       MR. CARTER:  Okay.
19       MR. MASTERSON:  We'll try to remember it,
20  too.
21       (Request.)
22  BY MR. STUBSON:
23    Q.   So other than that, the arrangement with
24  Kiribati, any other agreements you have with museums,
25  foundations, anybody else?

156

1    A.   No.
2    Q.   Okay.  And then you mentioned you had -- so
3  as we talk about the 2010 expedition, you had
4  SeaBotix on --
5    A.   Uh-huh.
6    Q.   -- as a contractor?
7       And that's a yes?
8    A.   Yes, I'm sorry.
9    Q.   And what -- obviously, the boats were --
10  were they crewed by independent --
11    A.   Yes.  The boats -- each boat was crewed by
12  independents.  The -- the primary expedition ship,
13  Nai'a -- which is N A I, apostrophe, A -- was what
14  was crewed by a Fijian crew.  The owners are American
15  expats living in Australia and Fiji, but the boat's
16  crew was Fijian, it was all Fijian for that trip.
17       And VvS1, the second boat, was out of
18  New Zealand, New Zealand or Australia, but that --
19  they had a New Zealand crew.
20    Q.   Okay.  The -- any other contractors you were
21  working with for 2010?
22    A.   Oh, well, contractors, we had -- there was a
23  desire to deploy ground-penetrating radar at the
24  Seven Site, the castaway camp site.  And we brought
25  along a young man who worked for the University of

157

1  Maryland, and they used ground-penetrating radar to
2  track the tree root systems of trees on campus.  And
3  we wanted to see if we could use ground-penetrating
4  radar to find any graves or bones or artifacts, or
5  anything, at the Seven Site.  So we had a contract
6  with the owner of the ground-penetrating radar,
7  TreeRadar, Incorporated, I think it was, and this
8  young man came along as the ground-penetrating radar
9  operator.  So you could call that a contract with a
10  specialist, yeah.
11     Q.   And what was that person's name?
12     A.   We called him Radar.  It really pissed him
13  off.  I'm trying to think of his real name.  It's
14  terrible, I can't remember his name.  We just called
15  him Radar.
16     Q.   And this was a contractor whose experience
17  primarily was in finding tree roots?
18     A.   Yeah.  Yeah.  Nobody had ever -- as far as
19  we could determine, had ever used ground-penetrating
20  radar in a coral reef -- or not coral reef, but a
21  coral rubble environment.  And it turns out it just
22  doesn't work well in a coral reef environment.  It
23  was a total bust.
24     Q.   Now, we talked a little bit about use of the
25  ROV.  And my understanding from your prior testimony

158

1  is that Jesse Rodocker was essentially the pilot --
2     A.   Uh-huh.
3     Q.   -- of the ROV?
4     A.   Yes, he was.
5     Q.   And did he operate from both the ships
6  involved in this expedition?
7     A.   Yeah.  Yes, he did.  He started out
8  operating off Nai'a.  But Nai'a is a single screw,
9  single propeller ship, and to deploy ROVs without
10  what's called dynamic positioning where you can just
11  dial in along the ship hold's position -- see, if
12  you're just putting the ROV over the side, it's
13  called live boating.  Live boating.  And you really
14  need a very maneuverable ship to do that accurately.
15  Well, Nai'a, for all her virtues, is not a really
16  maneuverable ship.  It was a single screw and a sail,
17  and so forth.
18        So after several frustrating days, when the
19  second ship showed up, VvS1 had twin screws, much
20  more maneuverable, so we moved, at Jesse's
21  recommendation, the ROV ops over to the -- over to
22  VvS1.  And that's where they remained for the rest of
23  the expedition.
24     Q.   Was anybody from TIGHAR tasked with helping
25  Mr. Rodocker --

159

1     A.   Yes.
2     Q.   -- in this operation?
3        Who was that?
4     A.   John Clauss and Walt Holm.
5     Q.   Okay.  And were they -- at the times the ROV
6  was being utilized, then, were they active and
7  involved in --
8     A.   Yes, they were.
9     Q.   -- that process?
10        And was their -- what were their jobs?
11     A.   Mostly, they were -- with an ROV you've got
12  this tether that has to be played out.  And
13  typically, Jesse would sit there flying the ROV.
14  He's watching the video screen which is showing him a
15  feed of what the ROV is seeing.  And that is also
16  being taped aboard -- well, taped.  I'm not sure if
17  it's taped aboard the ROV or taped on the surface,
18  but it was being taped.
19        So Jesse's doing that, and Walt and John are
20  handling this big, long awkward tether and trying to
21  keep it away from the propellers of the ship, which
22  didn't happen.  But that's their job, to manhandle
23  things.  And when they're not involved in that,
24  they're looking over Jesse's shoulder and watching
25  the video, too.

160

1     Q.   And that video, as you've said, Jesse has a
2  screen in front of him?
3     A.   Uh-huh.
4     Q.   And there were two kinds of video on the --
5  on the ROV --
6     A.   Yeah.
7     Q.   -- correct?
8     A.   Yeah, he had two screens there.  The
9  standard definition video, which the resolution isn't
10  great, and I think it's black and white, also, but it
11  has depth and heading information on it and time
12  information on it, superimposed on the screen.
13        The high definition camera doesn't have any
14  of that information on it, but it's a colored
15  picture, much, much better resolution.
16     Q.   And he had both of those available?
17     A.   He had both, sure.
18     Q.   And -- and when -- so my understanding from
19  your testimony, then, is when Mr. Clauss and Mr. Holm
20  were not working on the tether, they would be sitting
21  with him watching that?
22     A.   Sure.
23     Q.   And who was deciding where the ROV was
24  actually going to go?
25     A.   Jesse.

221

1 　A.　Yes.
2 　Q.　And the -- did you have an understanding
3 that Kiribati owned whatever artifacts may be either
4 on the island --
5 　A.　Absolutely.
6 　Q.　-- or off the island?
7 　A.　You know, we've always said that.
8 　Q.　Okay.  And so if you discover those, do you,
9 as TIGHAR, do you believe, have any rights at all to
10 the --
11 　A.　No.
12 　Q.　And you entered into an agreement with
13 Kiribati in 2011?
14 　A.　That's correct.
15 　Q.　And did that --
16 　A.　No, it's 2012; March 20, 2012.
17 　Q.　Okay.  And did that change the terms at all
18 under which you were operating?
19 　A.　Well, it gave -- it made us the exclusive
20 agent for the Republic of Kiribati for any
21 investigation of the Earhart disappearance within the
22 borders of Kiribati, but it didn't convey any
23 ownership or rights to the artifact to us.  There's
24 language in there about how, if -- if we -- if TIGHAR
25 recommends that Kiribati exhibit, try and monetize

222

1 these artifacts, that we would work with Kiribati to
2 work out an agreement where we would manage that for
3 them and have an equitable share in revenue that that
4 might generate.  But in terms of ownership, it's
5 still Kiribati's stuff.
6 　Q.　Okay.  And that arrangement for revenue
7 sharing did not exist prior to 2012?
8 　A.　It still doesn't exist.  What -- all -- all
9 the agreement does is say that if there's conclusive
10 evidence, if we reach a point in all this where it
11 would appear to be reasonable to put together a
12 museum display with these artifacts, that we would --
13 the next step would be to work out an agreement with
14 Kiribati for revenue sharing.  But there is no
15 agreement right now.
16 　Q.　So when you talk about being the exclusive
17 agent for Kiribati for purposes of looking for
18 Earhart artifacts, what does that mean?
19 　A.　That means that if you want to go look for
20 Amelia Earhart in Kiribati, you have to get
21 permission from TIGHAR.  Well, more specifically, you
22 have to come to TIGHAR and say I want to do this.
23 　　　And we will say to you, what is it you want
24 to do and what are your qualifications to do it?
25 　　　And if we decide that you are a good,

223

1 legitimate researcher who is going to follow good
2 scientific principles, we have no problem with you
3 doing that, and we will recommend to Kiribati that
4 you be given the PIPA permit to go to Nikumaroro.
5 　　　But we're purely in an advisory capacity
6 here; but anybody who wants to do research has to
7 come through us for our recommendation to Kiribati as
8 to whether you should be allowed to do that.
9 　Q.　And have you given permission to anybody to
10 do that?
11 　A.　There was a tourist group out of Samoa that
12 wanted to go there last year.  And we looked at it
13 and said, yeah, it's not a problem.
14 　Q.　Were they doing any searching?
15 　A.　They weren't doing any searching.  We
16 decided they were harmless.
17 　Q.　There's been no competing --
18 　A.　No.
19 　Q.　-- searchers that have asked for --
20 　A.　No.
21 　Q.　-- permission?
22 　A.　No.
23 　Q.　And then prior to the agreement in 2012, was
24 it the case that anybody could go out and look for
25 it?

224

1 　A.　Well, anybody would have to have a PIPA
2 permit to go into the Phoenix Islands Protected Area,
3 and jump through all the hoops that we went through.
4 But if somebody wanted to do that, to go and dig
5 around for Earhart stuff on the island, some amateur
6 group, yeah, there were no controls over it at all.
7 　　　Our greater concern was that if we get out
8 there and find some conclusive evidence, then this
9 site will really need to be protected.  And there's
10 no good way to protect it.  It's a very remote
11 location.  But at least you can have a law signed
12 where you can say no, you can't go in there and do
13 this.
14 　Q.　If you would have found something in the
15 2010 expedition and Discovery would have exercised
16 their right to publicize that finding, there -- would
17 TIGHAR have had any way of preventing folks from
18 going out there and doing their own expedition?
19 　A.　We don't have any physical way of protecting
20 the site, no.
21 　Q.　But you have -- you currently have legal
22 right, correct?
23 　A.　We have -- yeah.
24 　Q.　And you did not have that in 2010?
25 　A.　In 2010, no.