IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

---

| | |
|---|---|
| TIMOTHY MELLON, a Wyoming resident, | Case No. 13-CV-118-S |
| | Casper, Wyoming |
|       Plaintiff, | July 17, 2014 |
| | 8:36 a.m. |
|       vs. | |
| THE INTERNATIONAL GROUP FOR HISTORIC AIRCRAFT RECOVERY, a Delaware nonprofit corporation; and RICHARD GILLESPIE, | **ORIGINAL** |
|       Defendants. | |

---

TRANSCRIPT OF MOTION HEARING PROCEEDINGS

BEFORE THE HONORABLE SCOTT W. SKAVDAHL
UNITED STATES DISTRICT JUDGE

---

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | MR. TIMOTHY M. STUBSON |
| | Crowley Fleck, PLLP |
| | 152 North Durbin Street |
| | Suite 220 |
| | Casper, Wyoming  82601 |
| For the Defendants: | MR. JOHN A. MASTERSON |
| | MS. ALAINA M. STEDILLIE |
| | Lewis Roca Rothgerber, LLP |
| | 123 West First Street |
| | Suite 200 |
| | Casper, Wyoming  82601 |
| | and |
| | MR. WILLIAM J. CARTER |
| | Dean & Carter, PLLC |
| | 1112 Main Street, Suite 302 |
| | Boise, Idaho  83702 |

2

Court Reporter:          MS. ANNE BOWLINE, RMR, CRR
                         P.O. Box 1529
                         Casper, Wyoming  82602
                         (307) 235-3376


                    *    *    *    *    *




                    I N D E X

OPENING STATEMENTS                                        PAGE

Mr. Masterson                                                3
Mr. Stubson                                                 19
Mr. Masterson                                               34


MOTIONS                                                   PAGE

Ruling by the Court                                         40

3

```
 1        (Proceedings commenced at 8:36 a.m.,
 2        July 17, 2014.)
 3            THE COURT:  Thank you.  Please be seated.  Court is
 4   in session in the matter of Timothy Mellon versus The
 5   International Group for Historic Aircraft Recovery and Richard
 6   Gillespie, Case Number 13-CV-118.  I note the presence of
 7   Mr. Stubson on behalf of Mr. Mellon and the presence of
 8   Ms. Stedillie, Mr. Gillespie, Mr. Carter, and Mr. Masterson on
 9   behalf of defendants.
10            The matter is before the Court on a motion for
11   summary judgment filed by the defendants in this matter.  And
12   I would combine, despite the three -- I believe it was three
13   separate motions.  To facilitate page limitations, I will hear
14   from the parties on the motions combined, and I would hear
15   first from the movant.  And I've allocated, I believe --
16            THE COURTROOM DEPUTY:  30 minutes, Judge.
17            THE COURT:  -- 30 minutes a side.  So with that,
18   Mr. Masterson.
19            MR. MASTERSON:  Thank you, Your Honor.  And may it
20   please the Court, Mr. Stubson.
21            THE COURT:  Counsel.
22            MR. MASTERSON:  Your Honor, as I mentioned, I'm here
23   today with Bill Carter -- he is pro hoc vice counsel admitted
24   by the bar of Idaho for purposes of this case --
25   Ms. Stedillie, and Mr. Gillespie.
```

4

1          We're here today, Your Honor, on three motions for

2    summary judgment.  One deals with Mr. Gillespie being sued in

3    his individual capacity.  We've also asked you to dismiss the

4    remaining allegations against the defendants; that's fraud and

5    negligent misrepresentation.  If there is time left, Your

6    Honor, my goal will be to reserve a little bit of time for

7    rebuttal.

8          As a little bit of background, Your Honor, the

9    discovery in this matter is completed.  Depositions are done.

10   We've gone through the entire gamut of discovery, requests for

11   admission, interrogatories, requests for production.  I think

12   everybody is satisfied that everything's in good shape.  I'm

13   happy to tell you there hasn't been any discovery disputes of

14   note, but the record at this point in time for purposes of

15   these motions is closed.

16         You can sum up our motion, Your Honor, that at the

17   end of all of the discovery in this matter, the plaintiff is

18   without evidence to support his claims.  He has some

19   speculative ideas about what some facts may mean.  Those facts

20   aren't in dispute, but it's the characterization of those

21   facts that's used to try to cobble together a case to go after

22   the defendants.

23         There's no e-mails.  There's no admissions.  There's

24   no communication.  There's no, for lack of a better term,

25   smoking gun that shows TIGHAR and Mr. Gillespie committed any

1   sort of fraud upon Mr. Mellon.  And there is no evidence and

2   there's law lacking in the area of negligent misrepresentation

3   in the sense that the plaintiff hasn't shown us what any duty

4   might be, whether there was a violation of that duty, and

5   whether a dispute over opinions can support a judgment in his

6   favor for fraud or negligent misrepresentation.

7           Before getting into some particulars, Your Honor, I

8   think there's some overarching and fundamental points I'd like

9   to touch on.  The first is that I think you need to analyze

10  this matter in terms of everything that happened up to and

11  until Mr. Mellon made his donation to TIGHAR.

12          THE COURT:  That donation was made on March 30, 2012;

13  correct?

14          MR. MASTERSON:  Yes, Your Honor.

15          THE COURT:  So everything post March 30, 2012, is not

16  subject to consideration in terms of identifying whether or

17  not fraud or negligent misrepresentation occurred?

18          MR. MASTERSON:  Absolutely, Your Honor.

19          THE COURT:  In the reports that were filed by the

20  parties in this case, the experts noted that they reviewed the

21  2010 video as well as the 2012 video.  But in their reports

22  they don't identify where they draw their conclusions from.

23  How does that play out?

24          MR. MASTERSON:  Your Honor, I think it plays out in

25  terms of some motions in limine that are due today.  I think

6

1    that we will present those issues to the Court and argue them

2    with opposing counsel, because I think there is a serious

3    issue that by viewing those 2012 images, they've tainted their

4    findings and they've tainted their report in a very

5    fundamental fashion.

6            So you're going to see some of those issues and some

7    collateral ones get before you in the context of motions in

8    limine.  I think for purposes of what we're talking about in

9    the context of these summary judgment motions, I don't think

10   that factor really weighs into it.  And by that, I mean that

11   factor, you know, of having viewed that 2012 videotape,

12   because their conclusions that I'm going to talk about in a

13   minute don't seem to be -- they don't change based on that

14   review, from what I can tell.

15           So just to underscore what the Court asked, Your

16   Honor, if fraud was committed or negligent misrepresentation

17   was committed, it had to have occurred before Mr. Mellon's

18   donation.  And so that's also going to be a motion we're going

19   to submit to you to preclude any evidence of anything that

20   happened after the 2012 donation, but I think the point is

21   clear to the Court.

22           As far as the plaintiff's reply to our motions in

23   general, I'm going to -- I think some of their

24   characterizations are somewhat friendly.  I want to be clear

25   when I say this, Your Honor.  I have a great deal of respect

1    for Mr. Stubson.  I think he's the finest quality lawyer and

2    person.  And my experience with Mr. Oven has been great, and

3    when I talk about characterization of things, I'm not

4    talking -- and I want to make sure everybody in the room knows

5    I'm not saying anybody's misleading anybody.  But I think how

6    we characterize facts is something that we disagree with

7    deeply with the plaintiff.

8            So I'm going to talk about a couple of those for a

9    second.  And when I talk about these, Your Honor, we're not --

10   I'm not saying there's a factual dispute.  There's a dispute

11   in what those facts may mean.

12           So a couple of things.  In their brief at page 5, the

13   plaintiff notes, and to quote from their brief, "What TIGHAR

14   discovered was indeed a debris field that demonstrates the

15   presence of Earhart wreckage," and cites to his report.  On

16   page 4, they say, "The ROV," the remote-operated vehicle,

17   "filmed several pieces of debris that belonged to the Earhart

18   plane."  He again cites to his expert report.

19           But if you go and look at the expert report, it makes

20   no conclusive finding on that issue whatsoever.  In the expert

21   report that they filed with their brief, you have nine

22   numbered findings.  By my count, "inconsistent with" is used

23   once, "consistent or consistent with" is used five times,

24   "atypical" is once, "likely" is twice, "appearance" is once,

25   and -- my favorite -- "almost certainly not" is once, and "not

8

1    inconsistent with" is used once.

2         That is far from conclusive evidence of anything.

3    The expert reports I think are being generously construed as

4    finding that something demonstrates the presence of Earhart

5    wreckage.

6         The second thing by means of example of a

7    characterization, in their brief they refer to Glickman.  He's

8    a photo analyst.  He's not an employee or an agent or an

9    officer or board member of TIGHAR, but he does some forensic

10   imaging work for them.  It says Glickman's reviewed and

11   confirmed man-made objects consistent with the wreckage of the

12   aircraft.

13        Well, if you look at that -- that's Exhibit 3 to

14   their brief.  And if you look at that e-mail, you're going to

15   see that it -- nothing in that e-mail says anything that

16   Mr. Glickman is referring to is, quote, consistent with the

17   wreckage of the Earhart aircraft, nothing.

18        If you'll look at it, you'll see that it's a list of

19   things that Mr. Glickman believes he sees and, to be fair,

20   three "probably's" and four "possibly's" referring to possibly

21   rods or possibly wire.  Mr. Glickman never used the word

22   "aircraft," "airplane," "wreckage," or "debris field," so I

23   think the characterization is a little generous.

24        Then the plaintiff refers to an e-mail where

25   Mr. Gillespie asked Mr. Glickman to hold some things or some

1   findings or some observations close, meaning to himself, the

2   gentleman named Bob Brandenburg on the board of TIGHAR.

3   That's Exhibit 7 to the plaintiff's brief.

4          When you see something like that, you're tempted to

5   think to yourself something's amiss.  They're trying to hide

6   something.  Something's going on.  But in the context of the

7   video, you will realize that that whole disinformation, close

8   e-mail, actually predates the findings that I referred to in

9   Plaintiff's Exhibit Number 3.

10         In other words, that Exhibit 7 that says we want to

11  hold these findings close does not refer to the video evidence

12  that Mr. Glickman is referring to in a later April e-mail.  So

13  the context that these things are presented in the plaintiff's

14  brief I think is not an accurate characterization of what

15  happened.

16         In fact -- and I've got the deposition cite if it's

17  contested -- the e-mail about holding information close refers

18  to the -- what's called the Bevington object.  And we tried to

19  give you an idea of what that is in Mr. Gillespie's affidavit.

20  It's some sort of an anomaly in the photograph taken back in

21  1938.

22         THE COURT:  That was the Englishman -- it was 1937?

23         MR. MASTERSON:  '37 or -- yeah, I guess it would have

24  been late 1937.

25         THE COURT:  And that was off the reef in --

1          MR. MASTERSON:  Nikumaroro.

2          THE COURT:  Nikumaroro.  Okay.

3          MR. MASTERSON:  Then there's a wreck.  There's a

4    shipwreck on Nikumaroro of the *Norwich City,* and so he was

5    taking an image of that in -- it's prominently displayed on

6    the image.  You can see the research bulletin in that

7    photograph online at the citation we gave you.  It's on

8    TIGHAR's website.  Along with everything else in this matter,

9    all of the video is on YouTube or TIGHAR's website.  We have a

10   copy of it, Your Honor, if you want to look at it.  We've got

11   it on Ms. Stedillie's computer.  I think we can find it there.

12         Specifically as far as Ric as an individual, we're

13   asking you to dismiss him.  He's been singled out in this

14   case.  I understand and appreciate that Mr. Mellon wants to

15   hold Mr. Gillespie personally responsible.  In fact, in his

16   deposition Mr. Mellon stated that the purpose that he hopes to

17   get out of this lawsuit is to cure Mr. Gillespie's blindness,

18   professed blindness.  He didn't -- he didn't talk about money

19   being paid back or anything else.  He talked about curing

20   Mr. Gillespie's professed blindness.

21         No one else is sued individually in this matter.

22   Discovery Channel isn't.  Mr. Glickman isn't.  No board

23   members, not even Ric's wife, who is also an employee of

24   TIGHAR.  She wasn't brought in.

25         THE COURT:  But with respect to the solicitation, as

11

1    I understand the process, Mr. Mellon reads something in the

2    *Casper Star-Tribune*.  He then sends an e-mail to Mr. Gillespie

3    saying that "I'd be interested in funding, supporting,

4    contributing to the cause."

5            He's then contacted by Mr. Gillespie.  Mr. Gillespie

6    then sends him some materials.  Ultimately the stock is

7    gifted.  Mr. Gillespie was the primary -- not the sole person

8    involved in the communications with Mr. Mellon.  Is that fair

9    to say?

10           MR. MASTERSON:  I think that's completely accurate,

11   Your Honor.

12           THE COURT:  And doesn't Judge Johnson's decision in

13   *Wellborn v. Mountain Accessories Corp.*, 23 F.Supp.2d, 1321,

14   establish that individual liability in a corporate officer or

15   agent of a corporation where they are the one individual

16   that's involved with the tort, alleged tort?

17           MR. MASTERSON:  With all due respect, Your Honor, I

18   have not read the specific case that you're citing to.  But I

19   think that the factors that the Wyoming Supreme Court has

20   talked about -- what we're really talking about is a piercing

21   the corporate veil case.

22           If you -- if you look at the factors the Wyoming

23   Supreme Court uses to do that, they haven't alleged any of

24   them, and they haven't fulfilled any of those during the

25   course of discovery.  You don't have commingling of funds or

1   evidence that this is personal assets used for corporate

2   purposes.  If you look at the documents, including the

3   document that's attached to plaintiff's brief, you'll see that

4   it was signed in his capacity as executive director.

5           So I don't -- I don't -- I see, again, a lack of

6   evidence showing that Mr. Gillespie was an alter ego.  It

7   wasn't even pled in the complaint as some sort of an alter ego

8   or piercing case.  So without having the benefit of reading

9   the case you cited, Your Honor, I think that under Wyoming

10  law, it doesn't support that kind of an argument.

11          The other thing is, Your Honor, you can't have it

12  both ways.  It seems to me that either you're going to sue

13  TIGHAR or you're going to sue Mr. Gillespie personally.

14  Trying to hold them both responsible for anything that they

15  may be able to ultimately prove, that's not -- it seems to me

16  to be totally inconsistent with one another.

17          The donation was made to TIGHAR.  It wasn't made to

18  Mr. Gillespie.  He's signing documents as executive director.

19  I don't think there's any proof of any individual action done

20  by Mr. Gillespie as an individual, and there is not any of the

21  factors before you that would justify some sort of a piercing.

22          Your Honor, if I can talk, my time is precious, so

23  I'd like to talk for a couple minutes about the substantive

24  allegations.  They overlap, because the factual background is

25  obviously the same.  But it can be a little difficult at times

1    to parse them, because they're inconsistent theories.

2         So what I'm going to do is talk about negligent

3    misrepresentation for a moment.  I think there's two

4    fundamentally fatal defects plaintiff has as far as negligent

5    misrepresentation.  He has not dictated or told us or

6    supported any sort of a standard of care for the duty of a

7    nonprofit to a donor on an unrestricted gift.  In the absence

8    of that, we can't figure out what the standard of care is.

9    Without a standard of care, as you pointed out in your

10   decision on the 12(b)(vi) motion, that's a fundamental thing

11   that they've got to prove, and there's no evidence of what

12   that duty may be either in law or in fact.

13        Further, we're not sure of what exactly the

14   negligence they are claiming is.  How were they negligent?

15   What did they do?  What did they not do?  Did they not do a

16   proper investigation?  If so, how did they not do a proper

17   investigation?  Who should they have used?  Who should have

18   viewed these videotapes?  There is just no evidence of what

19   standard of care should be used.

20        THE COURT:  At this point I don't see any arguments

21   being asserted that -- well, I guess there is some question

22   about the ROV or the SUV or whatever the heck the thing is

23   that goes under water, but we don't have a lot of deep-water

24   dives in Wyoming.  Nonetheless, I don't see any discussion as

25   to, well, a professional recovery expert expedition would have

1    had these equipment sources and these things and that.

2          So what I -- I guess what I'm focusing on -- and

3    Mr. Stubson can correct me if I'm wrong, but it's a question

4    of whether or not false information was given to Mr. Mellon

5    and that getting that false information, TIGHAR and

6    Mr. Gillespie failed to use reasonable care in obtaining and

7    communicating.  I guess I don't see a question as to, "Well,

8    you were negligent in how you conducted the expedition.  I

9    think you're negligent in how you interpreted the information

10   and what you provided."

11         MR. MASTERSON:  All right.  And, Your Honor, even in

12   that regard, it's pretty clear, as you point out, that a

13   Wyoming jury isn't going to have a lot of experience in

14   underwater exploration or underwater archeology.  This is not

15   a layman's kind of job.  There's going to need to be expert

16   testimony about what the standard of care is, and the

17   plaintiff has not designated anybody to testify as to what

18   that standard of care is.  If you can't establish a standard

19   of care, then you can't have a violation of that standard of

20   care, and therefore, you're just, as a matter of law,

21   precluded from finding negligence.

22         The standard of care and the duty are issues of law

23   for you to determine.  They're properly before you.  And I

24   just don't see it.  I don't see it there.  He's designated

25   experts to talk about what they think they see in a video, and

1    that's it.  But there's nothing further.

2         The second -- the flip side -- it's not the flip

3    side.  A parallel thing to that is there's no expert to say

4    this is how TIGHAR screwed up.  So you have no evidence of

5    what the standard of care is and then you've got no evidence

6    about how TIGHAR messed it up.  In the absence of that, as a

7    matter of law, they can't -- they can't prove those essential

8    things in a negligent misrepresentation case.

9         The last thing, Your Honor, about negligent

10   misrepresentation and also about fraud is that this is about

11   opinions.  Opinions cannot constitute a material

12   misrepresentation and they cannot justify a fraud case.  This

13   case is nothing but opinions.  The experts that they had to

14   bring in rendered opinions.  TIGHAR's experts rendered

15   opinions.  Mr. Mellon's opinion -- I believe sincerely held,

16   but which we completely disagree with -- is an opinion.

17   Mr. Gillespie's beliefs are opinions.  And they are asking you

18   to let this case go to a jury based on a conflict of opinions.

19        THE COURT:  Well, on page 14 of Mr. Stubson's brief,

20   he says whether TIGHAR discovered that wreckage is an issue of

21   fact.

22        MR. MASTERSON:  But -- yes, Your Honor.  He's saying

23   that that is an issue of fact, but my point is that you can't

24   reach a fraud determination based on a difference of opinion.

25   And in our brief we cited to, the Wyoming Supreme Court's been

1    very explicit on that.  That case might be old but it's still

2    applicable law, still good, and it refers to law from a number

3    of jurisdictions.  I don't see how you can get around that.

4         A jury has to make determinations of fact, but, you

5    know, they're going to be doing it based on a whole bunch of

6    conflicting opinions.  How does that support a fraud claim?

7    Fraud involves clear and convincing evidence of a lie, and an

8    opinion just can't be a lie and an opinion can't be negligent

9    misrepresentation.  It can't be one of those things.

10        It's interesting you bring up the case about whether

11   the plane is there.  This is the kind of thing that keeps me

12   awake at night, is trying to figure out the relevance of that.

13   I think in the fraud sense it doesn't matter if the plane's

14   there or not because the question is, what did TIGHAR know and

15   when did they know it?  So, you know, was TIGHAR lying?  I'm

16   not sure that has much to do with whether the plane is

17   actually there, but as far as negligent misrepresentation,

18   maybe the fact that the plane is there is relevant.

19        But what keeps me tossing and turning is, how do you

20   ask a jury to litigate something that's objectively

21   determinable?  You know, if you can -- if you had a magic wand

22   and could pull up all these things off the ocean floor, you'd

23   know one way or the other if it's there.  We're going to be

24   asking a jury to decide if it's there, and what happens if

25   they say it's there and it's not?  I don't -- I don't know how

1   we apologize to TIGHAR for that, but it's an interesting

2   issue.  And I'm getting off track.

3            As far as fraud, it's about opinions.  I think that

4   there are the proof problems we've talked about.  To talk

5   about at least one of them real quick, the tent poles that the

6   plaintiff uses for his fraud claim is an antiquities agreement

7   with Kiribati and the Discovery Channel's exclusivity

8   agreement.

9            In their brief they state that the defendants

10  scrambled to get -- this is my characterization; I'll get to

11  the quote -- that the defendants scrambled to get an

12  antiquities agreement in place because they knew they had

13  found something and wanted to preserve it.  What that

14  overlooks is that the antiquities agreement doesn't grant any

15  of those things to TIGHAR.  There's no commercial benefit to

16  TIGHAR in that agreement.

17           I note that that agreement is referenced in the

18  plaintiff's brief, but the agreement itself isn't attached.

19  I'm not saying there's anything nefarious in that.  We have

20  copies to give to you today if you'd like to see it.  So

21  there's an inconsistency there where they say, "Look, this is

22  a conspiracy," and that the reality doesn't back it up even if

23  it were to rise to clear and convincing evidence.

24           THE COURT:  There are various items listed in the

25  antiquities agreement.  It's a handwritten agreement.  There

18

1   was some handwritten agreement that identified various items.

2   Are those items that have been seen or items that have

3   actually been reduced to possession?

4           MR. MASTERSON:  Your Honor, the handwritten document

5   that you're referring to is an older agreement that was an

6   attempt to specify what happened with artifacts that had

7   already been found.  The antiquities management agreement --

8   I'll get a copy, if I may, Your Honor.

9           THE COURT:  You may.

10          MR. MASTERSON:  The antiquities management agreement

11  that's referenced in the plaintiff's brief -- I just gave your

12  clerk and the Court a copy of it -- that's a different

13  agreement.  That's a prospective agreement that just outlines,

14  you know, who's going to have what rights to what.  But if you

15  take a look at that, you'll see there's no commercial benefit

16  to TIGHAR in there.  They're not going to make a lot of money.

17  The only thing they did is rights to a film or maybe write a

18  book about it.  It doesn't grant any commercial benefit.

19          The Discovery Channel agreement, I don't think we can

20  make anything out of that either, except this:  All of the

21  footage, all the video, everything that TIGHAR got from the

22  2010 expedition was turned over to the Discovery Channel.

23  They had an exclusive right to announce any finding under that

24  agreement.  They had the chance and the opportunity to have

25  any expert they wanted look at it.

1          Then that footage in December of 2011 is posted on

2     YouTube.  No one finds anything.  Discovery Channel, who was a

3     sponsor of the expedition, that was their consideration for

4     giving the agreement and the exclusivity agreement.  They

5     never announce anything.  They don't see it either.

6          The things that they try to rely on to prove fraud

7     and try to ascribe a nefarious purpose for just don't pan out

8     at the end of it all.

9          Your Honor, I'd like to try to reserve a little bit

10    of time for rebuttal.  I've got about six minutes, so I'll sit

11    down if that's acceptable to you.

12          THE COURT:  Thank you, Mr. Masterson.

13          Mr. Stubson.

14          MR. STUBSON:  May it please the Court and Mr.

15    Masterson.

16          THE COURT:  Counsel.

17          MR. STUBSON:  Your Honor, I think the nature of both

18    the briefing in this case and the argument you just heard

19    drives the point home that this is a case that a jury should

20    be allowed to hear.  And, you know, as eloquent as the

21    argument was that was made to you, it's an argument that

22    sounds like a closing argument, an argument that talks to a

23    jury about what implications they should draw from the

24    evidence that's presented to them, about how they should weigh

25    the various e-mails, the various agreements that have been

1   presented as part of our summary judgment materials.

2           THE COURT:  If the jury has to decide whether or not

3   Amelia Earhart's plane and wreckage has been discovered, then

4   isn't that in and of itself defeating the fact that

5   Mr. Gillespie and/or TIGHAR has misrepresented itself?

6           MR. STUBSON:  No.  In fact -- and I'm certain that

7   that's an argument that TIGHAR will make, that -- but really

8   what you see in these facts is those -- a review of the video

9   by Mr. Mellon, who under his own deposition has no experience

10  in underwater searches, no experience in underwater video

11  analysis.  He has no experience in looking for wreckage, and

12  yet he, in a brief review of the footage, found the wreckage.

13  This is long before any expert opinions came along to confirm

14  it so that we can have them say, "Yeah, that's exactly what

15  they found."  But that's the evidence.  A guy with no training

16  found the wreckage.  That's the evidence the jury will hear.

17          THE COURT:  But his experts don't even conclude that

18  he found the wreckage.

19          MR. STUBSON:  I disagree with that assessment as

20  well.  I think if you talk about the qualifications in their

21  expert report, what they come down to at the end of it, you

22  talk about "consistent with" and that sort of thing.  But

23  really, if you look at paragraph 9 on Exhibit 4, what they say

24  is, "Look, you have man-made objects, and absent any other

25  explanation, these are likely Earhart aircraft."  I mean, and

1    that's as the more probable than not standard.  That's the

2    standard that any expert has to meet in a trial.

3           And so you end up with that question of, yes, is the

4    wreckage there but also the second question of, did they know

5    it?  And did they fail to tell?  And those are really two

6    questions of fact that remain after you look at all the

7    submissions that have been given to you both on our side and

8    on the defendants'.

9           THE COURT:  I struggle, Mr. Stubson, because it seems

10   like it's a cart and a horse.  A jury's got to figure out

11   whether or not there's a cart and then figure out if there's a

12   horse after the cart.  Is that consistent with how that

13   standard applies?

14          MR. STUBSON:  And I would explain the case a little

15   bit differently, Your Honor, because what you're -- in some

16   respects what Mr. Masterson said is right, which is really the

17   key fact that the wreckage is there.  And it is there, and

18   we've got proof that it is there.  Or is the key fact that

19   TIGHAR knew it was there and misrepresented the fact?

20          And so as you go through the factual record that's

21   presented to you, and you have a factual record that

22   demonstrates that, yes, they reviewed the footage in April of

23   2011, they found out that there was wreckage consistent -- or

24   items on the sea floor consistent with the wreckage, and that

25   they represented -- they didn't represent that to Mr. Mellon

```
1    in obtaining his $1 million donation, then --
2              THE COURT:  What did they represent to Mr. Mellon?
3              MR. STUBSON:  That they were going out there to find
4    the airplane.  And how is that not a misrepresentation when
5    you have already found the airplane?  And that's really the
6    nub of the question.
7              And if you -- if you go to Mr. Mellon and say, "Give
8    us money so that we can find the airplane," he -- that's what
9    he wants to do.  He wants to find the airplane and he gives
10   them money, but they've already found it.  That's fraud.
11   That's a fraud led to induce certain actions, which it did,
12   and induced certain actions to his detriment.  And those are
13   the elements of fraud that we need to prove.
14             Bouncing back, if I can, unless you have another
15   question on that issue --
16             THE COURT:  No.  Go ahead.
17             MR. STUBSON:  -- I do want to talk briefly about
18   the -- what I think is probably the single legal issue that's
19   presented by the defendants in their briefing, and that is
20   this issue of the liability of Mr. Gillespie as an individual.
21             And I think that the defendants in several respects
22   turn our claim on its head and argue -- for example, we heard
23   the argument about piercing, which is really, how do you get
24   at an individual's assets for the conduct of a corporation?
25   We're not trying to do that in this case.  We're trying to get
```

1    to the individual for the individual's conduct, not the

2    corporation's conduct.

3           Then they turn it on its head again in their briefing

4    by listing governmental immunity claims, which is, you know,

5    can we protect an individual who's acting in the scope and

6    course of their duties?  You can't protect them if they acted

7    tortiously, and that's what the *Wellborn* case says that you

8    cited.

9           It makes -- it sort of violates the notions of common

10   sense that I could come to you, intentionally misrepresent a

11   fact, damage you as a result of that misrepresentation, but,

12   boom, I have immunity because I happen to be doing it on

13   behalf of my company or organization.  And so even though I

14   committed intentional fraud, all of a sudden I've wandered

15   into some sort of immunity.

16          It violates common sense, but it also violates

17   *Wellborn* and the cases that support it, which say, of course,

18   if you're an individual and you engage in tortious conduct,

19   you can be held liable for that conduct.  That's all we're

20   saying in this case.  It's pretty straightforward.

21          And that does take us towards the meat of the

22   questions of fact surrounding the fraud claim.  And again, you

23   have a discussion by Mr. Masterson here that we -- we're

24   asking for improper -- or implications to be drawn from the

25   evidence, but that's a jury's decision.  What does that

1    evidence show, that is a jury decision.

2           And I take, for example, the discussion of Exhibit 7

3    that was brought up in Mr. Masterson's discussion.  And this

4    is the exhibit -- this is the e-mail where there's -- it's to

5    TIGHAR's board.  It talks about this discovery and it says,

6    you know, quote, "News like this is good.  It's so good that

7    it could prompt some hotshot millionaire glory hunter to

8    decide to beat us to the treasure," and then it talks about

9    keeping it close to the vest.  And Mr. Masterson argues, "Hey,

10   we -- we're talking the Bevington object in this.  We're not

11   talking about any other discovery."

12          And then you look at Mr. Gillespie's affidavit, and

13   what does it tell us about the Bevington object?  It says they

14   discovered that Bevington object.  It first drew their

15   attention.  They first started analyzing it and first alleged

16   its implications in 2010, before this e-mail was even sent.

17          So how much sense does that make that this treasure

18   is something that they've known about for a year and been

19   acting on for a year?  Those are arguments a jury should be

20   able to hear, implications a jury should be able to decide

21   what to draw on what that e-mail means.

22          And when you look at the record as a whole, what it

23   tells you is this story that TIGHAR went to Nikumaroro in

24   2010.  They had an ROV.  They searched in an area that they

25   believed the wreckage would be found right adjacent to where

1   that Bevington object had been observed and, lo and behold,

2   they find two pieces of man-made material there, the rope and

3   the wire.  And they realize it's significant.  They admit they

4   realize it's significant.  That night they decided they have

5   to go back and find it and see what it is.  They can't find it

6   again because of some technical issues that I don't need to

7   bore you with.

8          But then every indication is they go back.  They

9   really -- there's no thorough analysis of the footage.  They

10  don't -- there's no indication they really look at it much at

11  all after the expedition until this April 2011 time frame,

12  where you have this series of e-mails that says, "Hey, there's

13  footage we didn't even -- I forgot there was this footage out

14  there.  We didn't know about it.  We need to conduct a

15  material examination of this footage."

16          And they start, of course, with this rope and wire,

17  the one place where there was man-made objects, you know,

18  250 meters, 275 meters below the sea, right adjacent to an

19  uninhabited island, right in the 300-meter-by-300-meter area

20  that they thought they'd find the wreckage.

21          THE COURT:  Within 400 meters of the *Norwich City*.

22          MR. STUBSON:  Which everybody agrees -- our experts,

23  their experts -- nobody contends this is related to the

24  *Norwich City*.  Everybody contends that this is separate and

25  apart from the debris field of the *Norwich City*.  And so

1    that -- I mean, so that's not really an issue.  Yeah, the

2    *Norwich City* is there, but this is in an area that they were

3    specifically looking and specifically anticipated the wreckage

4    to be at.

5          And so they looked at it, and then we have this

6    series of e-mails that shows they know they found something.

7    And again, we should be able to show these to a jury and make

8    that argument to them.

9          THE COURT:  You attached Exhibit 17, which is an

10   e-mail discussing probabilities and possibilities and

11   concludes that there's an 80 percent chance that the Bevington

12   object is a Lockheed Electra 10E landing gear.  80 percent,

13   previously 60 percent.  But that wasn't even concluded until

14   September of 2012.

15         MR. STUBSON:  If I can talk about the 2012 evidence

16   for a minute, because it is material, and here's why it's

17   material.  Of course, any representation, any knowledge we

18   need to measure from the time that they -- prior to the

19   donation of Mr. Mellon.  That's clear.  But to the extent that

20   TIGHAR's conduct after that point provides evidence sheds

21   light on what they knew prior to that point, it is certainly

22   material.

23         And so what you see in 2012 after the 2012 expedition

24   provides significant evidence that they knew going into the

25   2012 expedition what was out there.  They knew going into the

1    2012 expedition that they had this debris field there, and you

2    can see it from the conduct after the 2012 expedition.

3            What I mean by that is this:  So we have a period

4    after 2010 nine months after they analyze the footage.  What

5    happens after the 2012 expedition?  Within days they send

6    footage from the exact same area they filmed in 2010 to

7    Mr. Glickman within days.  We have the e-mails, again, from

8    April of 2011.  How did they treat the information?  Let's

9    hold this close to the vest, not let anybody know what's going

10   on.

11           And then in 2012 what do we have?  We have an e-mail

12   from Mr. Gillespie to Mr. Glickman, who says, "Hey, you know,

13   this Discovery show" -- and this is on August 10, 2012.  The

14   Discovery show is going to be on on August 19.  Quote:  "It

15   would be more than nice if you could come up with something

16   interesting before then," close quote, and then, boom, within

17   days we have a report from Mr. Glickman of a debris field.

18           And so we have -- take it one step further.  We file

19   this case.  All of a sudden, boom, there's no debris field.

20   In fact, we talked to Mr. Gillespie in his deposition:  "Have

21   you found anything in the water that's even consistent with

22   the plane?"

23           "No.  No, sure haven't."

24           Well, that finding's made, and that's where

25   Exhibit 17 comes in.  He makes that representation under oath

1   when his own volunteer expert, the guy that they say they rely

2   upon to look at these videos and analyze them, has made the

3   determination in number 1, of which I just read, what is the

4   probability we have found man-made items in the diving

5   imagery?  100 percent.

6          So you have -- if you look through time prior to 2010

7   and after the 2012 episode and then after the lawsuit, you

8   have a series of representations by TIGHAR of what the status

9   of the search is, of what they found.  That shifts with what

10  they need.  That shifts with the demands of TIGHAR.  If they

11  need to promote a Discovery video, bam, they found something.

12  If they get sued because they failed to disclose it, bam, they

13  didn't find it.  If they go to Mr. Mellon in March of 2010 to

14  solicit moneys to search for the wreckage, bam, they didn't

15  find anything.

16         So, Your Honor, that series of evidence, that pattern

17  of conduct and changing representations is material, is

18  important, is something a jury should be able to hear when

19  they're deciding, did TIGHAR really know that wreckage was

20  there?  Did they misrepresent it?

21         And going on to the -- I want to talk just for a

22  minute about this issue of opinion, and there's an argument by

23  defendants that this is just a matter of opinion and you

24  can't -- you can't bring a fraud claim on it.  To the extent

25  they kind of pursue it, they're accurate that the law in

1    Wyoming is if you have a statement of intent or an opinion,

2    that's not actionable in fraud.

3              But two points on it.  First is understanding what is

4    opinion in the law.  And it is clear under the law in -- I'll

5    cite you to the *White v. Auburn* case, which is a Wyoming

6    Supreme Court case.  It talks about this.  It says if, under

7    the guise of opinion, you're affirming a known fact or

8    affirming an existing fact, that's a misrepresentation.  And,

9    you know, even in intent, if you state your intent to do

10   something, the Wyoming Supreme Court has ruled if you state

11   your intent to do something but at the time you state that you

12   don't have any intent to do that, that's fraud.

13             So back to the opinion issue.  And I was trying to

14   think of a good example of this, you know, boil it down to the

15   typical bad house case.  Maybe I've had a house for ten years.

16   Every year it floods a couple times, and I observe that all

17   the time.  I haven't done anything to change it.  I haven't

18   done anything to remediate it.  And I'm asking, do you think

19   this basement will ever flood?  No, I don't think this

20   basement will ever flood -- by a buyer of the house.  Is that

21   fraud?  Of course it is.  You have no reasonable basis to make

22   that statement.  You are misrepresenting the current factual

23   issue of the status of that basement.  That is fraud.

24             And so you have to come and look at these

25   representations through that sort of -- that sort of

1    understanding of what opinion means in that context.

2          Let's go to this case.  And as you pointed out in our

3    brief -- and really, I mean, it's that straightforward.

4    Whether there was an airplane at the bottom of the ocean, that

5    is a question of fact.  Whether they knew there was a plane

6    there, that's fact.  Whether they lied about it, that's fact.

7    That's not opinion.

8          And you can talk about the experts and the

9    probabilities and all that sort of stuff, but if we have

10   evidence that they knew there was wreckage there and they

11   misrepresented it, that's fact.  It's not opinion, and it's

12   actionable.

13         THE COURT:  But it's one thing for there to be

14   wreckage; it's another thing for it to be wreckage of Amelia

15   Earhart's airplane.

16         MR. STUBSON:  And that's right.  And you have -- for

17   example, in the Jarrell report, when you have a part that's

18   identified -- which, by the way, is the same part that's

19   identified as the Bevington object -- was formed here that is

20   a specific part to the Electra 10E which matches up the exact

21   dimensions.  You have the half circle but a couple geometric

22   shapes on that that aren't natural, that are man-made, and the

23   angles on these geometric shapes that match up exactly with

24   what's on the gear.  And as Jarrell goes on, there's no other

25   explanation for it.  It's likely the Earhart aircraft,

1    specifically identified to the Earhart aircraft.  It either is

2    or isn't.  That's not opinion.

3            Moving on to the negligent misrepresentation claim,

4    the -- when we talk about the difference between negligent

5    misrepresentation and fraud, we're really talking about, was

6    the misrepresentation intentional or was it -- did they know

7    there was wreckage there or should they have known there was

8    wreckage there?

9            And again, even the defendants in their own pleadings

10   recognize, you know, expert testimony isn't needed if it's a

11   matter within a layperson's purview, if a layperson can tell.

12   And again, I go back to what I was talking about earlier.  You

13   have Mr. Mellon, a guy that has no training in any of these

14   issues, that identifies the wreckage.

15           A jury should be able to say, yeah, they should have

16   recognized the wreckage, and they misrepresented that.  They

17   should have known the wreckage was there and may have

18   misrepresented it.  That's a layperson standard, a layperson

19   review, a question of fact of whether they acted reasonably in

20   determining whether those -- whether those representations

21   were accurate or not.  And that's really what you're talking

22   about, is the reasonable person standard.  Did they act

23   reasonably?

24           But even if we move beyond that, the fact that that's

25   a layperson issue generally, if you go down the path a little

1   ways that the defendants invite and say, "Hey, we're really

2   looking at how the expedition was done and whether they should

3   have identified that wreckage or not," their own testimony and

4   experts -- and we've cited in the issue of scale particularly

5   in our briefing -- make clear that TIGHAR made some very

6   fundamental mistakes in the way they conducted this

7   expedition.

8          And you talk about Mr. Gillespie's testimony, and

9   Mr. Gillespie -- and we're talking about, you know, why don't

10  you believe they can identify things in this footage?  Well,

11  there's no scale.  You have to have scale.  You have to be

12  able to determine how big things are to have any hope in

13  determining wreckage.  That's a basic premise.  That's

14  essentially the testimony that was offered by Mr. Gillespie in

15  his deposition.

16         You go to Mr. Glickman, their photographic expert,

17  his criticisms of why there's no way we can identify wreckage

18  even though he said he's 100 percent sure it's man-made.

19  There's no way we can do it, because there's no scale.  And

20  what's the second most important thing you're looking at when

21  you're examining imagery?  It's scale.

22         We go to their own experts, their own expert

23  criticism of Mr. Jarrell's work.  And by the way, Mr. Jarrell

24  and his colleagues have been able to establish scale.  It's

25  been very difficult.  It's been time consuming and expensive,

1   but they've been able to do it.  But they criticize the work

2   again by saying you can't make those determinations because

3   there's no scale.

4          And then we go to Jesse Rodocker.  He was the pilot

5   of the ROV in the 2010 expedition.  And we talk to Jesse

6   Rodocker and we say, "Are there easy ways, are there basic

7   ways or standard ways of determining scale?"  And he says

8   yeah, and he names a couple different ones.  But one of the

9   ones he mentions is there's a laser sight that you mount right

10  on the ROV that shoots two lasers out a given distance.  And

11  so anywhere the ROV's looking, you can determine what the

12  scale is.  SeaBotix, the provider of the ROV, had those, had

13  those readily available.

14         Did you ever talk to TIGHAR about that?  Did you ever

15  talk to them about anything to determine scale, when they're

16  supposedly searching for the wreckage that they now say is

17  impossible to identify if you don't have scale?  No, never

18  talked about that, never asked for anything to determine

19  scale.

20         So even though the fact is that there is significant

21  evidence in the record that TIGHAR did some very basic things

22  that they -- made some very basic mistakes that they're now

23  blaming on the fact that they can't identify wreckage, and so

24  that again is an issue that a jury should be able to hear.

25         Your Honor, I think I've got a little time left, but

1    I'm going to go ahead and wrap it up unless you have

2    questions.  I think, as we walk through these issues, the fact

3    is that there is a record here that shows that TIGHAR knew

4    that it was there.  They knew it was there, and they -- yet

5    they represented to Mr. Mellon that they were going out to

6    search for an aircraft.

7              THE COURT:  In terms of "knew it was there," what --

8    you've identified the worm gear and that was based on the

9    Bevington photo and subsequent review of the ROV video.  What

10   other things do you say they knew were there?

11             MR. STUBSON:  There's a couple different items.

12   There's the worm gear, and it's all part of the tail -- the

13   landing gear assembly.  And most of the parts identified that

14   we talked about are parts of that landing gear assembly.

15             THE COURT:  Do you agree that the Cook photograph is

16   not part of the analysis?

17             MR. STUBSON:  I do agree with that, Your Honor.

18             THE COURT:  Go ahead.

19             MR. STUBSON:  And, Your Honor, I guess I'd just end

20   with this.  We had an excellent discussion about what all of

21   these facts mean, about what the implication of these facts

22   are, and it's something that a jury should also have the

23   benefit of this discussion and be able to make a decision.

24             THE COURT:  Thank you, Mr. Stubson.

25             MR. MASTERSON:  Your Honor, a couple of

1    clarifications, and the first one we need to clear up is that

2    the repeated mention that Mr. Mellon was solicited by TIGHAR.

3    Actually, they -- Mr. Mellon, as you pointed out, he e-mailed

4    them and then after one telephone conversation volunteered to

5    give this donation to them.

6         And maybe -- I bring that up because this is about

7    characterization of facts.  I don't think that there's a

8    dispute as to these kind of facts.  But how we are

9    interpreting those things is relevant, because the standard is

10   clear and convincing evidence.  It's their job --

11        THE COURT:  Is it clear and convincing evidence as to

12   both claims or just as to the fraud claim?

13        MR. MASTERSON:  Only as to the fraud claim, Your

14   Honor.  So as far as the fraud claim goes, you've got a clear

15   and convincing evidence standard, and I don't think that they

16   have any evidence that approaches that.  Clear and convincing

17   is still the standard in summary judgment.  That's very clear.

18   And they have shown you nothing that rises as a matter of law

19   to that level.

20        As far as the fraud count, also, Your Honor, the

21   question in the fraud count is, what did TIGHAR know and when

22   did they know it?  The expert determinations mean nothing as

23   to the fraud count.  It's totally irrelevant.  It doesn't have

24   anything to do with proving what TIGHAR knew.  And they have

25   no evidence, because it doesn't exist that TIGHAR knew they

1   had found the plane.

2         THE COURT:  But doesn't that negligent

3   misrepresentation component include, though, knew or

4   reasonably should have known?

5         MR. MASTERSON:  The negligent misrepresentation does,

6   Your Honor, absolutely.

7         THE COURT:  All right.

8         MR. MASTERSON:  The fraud count does not.  As far as

9   the negligent misrepresentation, Your Honor, I don't know if I

10  could disagree more about the characterization of whether

11  anything that happened after Mr. Mellon's gift is relevant.

12  If fraud or negligent misrepresentation happened, it had to

13  have happened before his donation.

14        Under the plaintiff's theory, it was those -- that

15  negligent misrepresentation or fraud was the trigger for the

16  donation.  It was how they bamboozled the experienced

17  businessman who never did any due diligence into giving a

18  million dollars to them.  At that point in time it's

19  completed.  It's over with.  So I maintain and I think it's

20  very clear that anything after the donation is not pertinent.

21        THE COURT:  But if the correspondence and

22  communications between TIGHAR and its various experts revealed

23  that they now have data that they had before but didn't

24  realize that they had, I think the HD ROV, or whatever, or

25  some other item that they now take another look at that

1  existed prior to the date of the alleged fraud or negligent

2  misrepresentation, doesn't that statement become relevant to

3  show that they knew or reasonably should have known back then

4  had they done the review?

5       MR. MASTERSON:  I think if you could establish that

6  they should have done something before the donation and if you

7  have some sort of a communication and if you had evidence from

8  somebody who could say that was a deviation from the standard

9  of care, that may be the case.  A jury might be able to find

10  that.  But it doesn't exist, and the standard of care doesn't

11  exist.

12       And whether or not they go back -- you know, Your

13  Honor, how about this?  What happens if TIGHAR did everything

14  that it should have done under 2010 standards, under 2010

15  evaluation of undersea footage, and then technology changes?

16  Well, the question is, were they -- were they abiding by the

17  standard of care that existed at the time?  And there's

18  nothing to tell us what that is, and there's nothing to tell

19  us what they did or didn't do.  And without that, you can't go

20  forward with negligent misrepresentation.

21       I'd like to underscore, Your Honor, that no one,

22  including the plaintiff's expert, reaches any sort of a

23  conclusive opinion.  No one says the words "aircraft

24  wreckage."  There's a difference, and I think we need to pay

25  attention to it.  There's a difference between an anomaly, a

1   man-made object.  Man-made object does not equate to airplane

2   wreckage.  Airplane wreckage does not equate to Amelia

3   Earhart.  We don't know what this -- this language in the

4   expert report of plaintiff at the exclusion of other causes,

5   there's nothing in his report to say he excluded other causes.

6           Yes, this is a deserted island right now.  The Coast

7   Guard occupied this thing during World War II by a LORAN

8   station.  There was a settlement there by the British up until

9   1963.  You have fishing lines that are found there.  It's

10  uninhabited, yes.  It's isolated, yes.  But there are other

11  things that come into play other than -- there's a man-made

12  object, a rope or a wire, which we agree, yeah, it looks like

13  a rope or a wire.  And we went back to try to find it and

14  because of ROV failures that everybody agrees happened, we

15  couldn't find it.  Is that negligence?  I don't think it is.

16          I'm out of time, Your Honor.  I don't know if I can

17  answer anything for you, but we'd ask you to grant these

18  motions.  Send TIGHAR back to what it does best.  This is

19  fascinating stuff.  I mean, fact, background-wise, this is

20  really interesting.  But as a matter of law, they can't do it,

21  and we'd ask you to send TIGHAR home to do what they do best.

22          THE COURT:  All right.  Thank you.  I smirk because I

23  have to say that it is not a typical case that I have before

24  me and certainly is interesting.  But I'm going to take a

25  couple minutes and I want to look at a couple things, and I'll

1    be back.

2        (At 9:33 a.m., a recess was taken until

3        9:39 a.m.)

4            THE COURT:  I note that there are three motions for

5    summary judgment that have been filed in this matter by

6    defendants:  one addressing fraud, one addressing negligent

7    misrepresentation, and one addressing the personal claims as

8    to Mr. Gillespie.

9            With respect to the fraud and negligent

10   misrepresentation claims, at this time the Court would advise

11   the parties that I want to go back and review some of the

12   documents and references that have been made and to verify

13   certain information and case law, and I'm not prepared to

14   issue a decision regarding those opinion motions.

15           With regards to the legal premise, frankly, as to

16   Mr. Gillespie's potential individual responsibility or

17   liability to the extent that the claims were fraud and/or

18   negligent misrepresentation go forward, the Court would find

19   that based upon Wyoming law as interpreted by the Tenth

20   Circuit and subsequently by Judge Johnson in *Wellborn v.*

21   *Mountain Accessories*, there are genuine issues of material

22   fact that support the assertions that Mr. Gillespie was

23   personally involved in the communications that resulted in --

24   and I'm careful to say solicitation, because the way it worked

25   was -- and I think it's undisputed -- Mr. Mellon received

40

```
 1    information through a newspaper article.  He then sent an

 2    e-mail to Mr. Gillespie.  Mr. Gillespie then responded, and

 3    ultimately the donation was made.

 4           Bottom line is, Mr. Gillespie was an individual

 5    involved in that communication that resulted in the donation

 6    and is the basis upon which the negligent misrepresentation

 7    and fraud claims are based.  Thus, a corporate officer may be

 8    held liable to a third party if she directs or participates

 9    actively in the commission of a tortious act.  That's cited

10    out of Wellborn v. Mountain Accessories Corp., 23 F.Supp.2d,

11    1321.  Wellborn is W-E-L-L-B-O-R-N.

12           So as far as the legal issue, the Court would deny

13    the motion for summary judgment as to the individual defendant

14    claims against him and take under advisement as noted the

15    other two motions.  And I will -- I'm certainly aware of the

16    various deadlines that are approaching regarding preparation.

17    I believe it's best to render a decision on those matters in a

18    timely way to minimize the resources and give the parties a

19    good idea as to where we stand.

20           So with that being said, I appreciate the excellent

21    briefing and oral advocacy of the parties, and we stand in

22    recess on this matter.  Thank you.

23        (The hearing proceedings were concluded at

24         9:42 a.m., July 17, 2014.)

25
```

1                        C E R T I F I C A T E

2

3           I, ANNE BOWLINE, Court Reporter in the state of

4    Wyoming, a Registered Merit Reporter and Certified Realtime

5    Reporter, do hereby certify that I reported by machine

6    shorthand the proceedings contained herein on the

7    aforementioned subject on the date herein set forth, and that

8    the foregoing 40 pages constitute a full, true, and correct

9    transcript.

10          Dated this 23rd day of November, 2014.

11

12

13

14                    /s/ Anne Bowline

15                     ANNE BOWLINE
                  Registered Merit Reporter
16               Certified Realtime Reporter

17

18

19

20

21

22

23

24

25